still subsists as before the bankruptcy, and the bankrupt's discharge does not release him from his obligation to pay the rent. On the other hand, a trustee may, with the landlord's consent only, surrender the lease, in which event the landlord regains full possession, and all obligations between the landlord and tenant under the lease are at an end.

[4] There is no question that the right to forfeit and terminate the lease existed on the part of the landlord by the specific terms of the lease. Not only was this the landlord's right under his lease, but it would appear to be his only safe course to pursue, in view of like provisions in the Phipps lease, under which the landlord held. Has the right of forfeiture been waived by the landlord by the acceptance of the December rent? I think not. The forfeiture was duly declared on December 24, 1925, and due notice thereof given by the parties in interest. This included notice to the receivers of the forfeiture declared, and a reasonable time was offered to the receivers to remain in possession of the premises for the purposes of liquidating the property of the bankrupt. It may be fairly said that the rent demanded therefor was rent for the use and occupancy, and not as rent under the original lease, as the notices and letters duly advised the parties of the termination of the lease by the forfeiture declared by the landlord.

When the check from the receivers was received on December 31, 1925, the receivers were advised by letter that the same was accepted as rental only for use and occupancy by the receivers of the premises, and not in any manner a recognition of the former tenant, and was not received as rent under the original lease, and was not to be regarded as a waiver of the forfeiture declared under the lease. To this the receivers made no objection. If this was not satisfactory to the receivers, they should have so stated; failing to do so, they are presumed to have acquiesced under the condition which the landlord imposed on the acceptance of the check. On January 15th the receivers, in offering payment for January rent, for the first time declared: "We feel the lease is an asset of the bankrupt, and that it will be held as such." Immediately the landlord, through his attorney, notified the receivers by letter that the check would not be accepted in payment of rent under the original lease, but only as an administration expense of the receivers for use and occupancy of the premises, and, unless such was the understanding, said check would be returned. To this the receivers made no reply, and thereupon the January check was returned to the receivers; the landlord again reiterating that a forfeiture had been declared and the original lease was terminated.

[5] Under all these circumstances, the unquestioned right of forfeiture, which existed under the terms of the lease, has not, in the court's opinion, been waived by the landlord. It appears that in January of 1926, after due advertisement, the receivers offered for sale the interest of the lessee in the said leasehold and received no bids therefor, and the same was true at adjourned sales held on January 20, February 6, and February 9, 1926. This would indicate that the leasehold, in case it existed as an asset of the estate, was not regarded as valuable. The policy of the law would not favor the action which the receivers are undertaking here to assert. It is a general rule that the trustee in bankruptcy will not be allowed to assume a lease, where it appears that to do so would prevent him from winding up the estate for several years. Especially is this true when it is problematical whether or not the assumption of such lease would prove to be of benefit to the estate. If it is a mere conjecture, such proposition would not be entertained, as it is the clear duty of the trustee and the purpose of the law to wind up the affairs of the bankruptcy and distribute the proceeds to the parties entitled.

The court, therefore, holds as a matter of law, under the facts presented, that the forfeiture of the lease by the landlord was effective and terminated the lease, and that the receivers and trustee had no right, title, or interest in the lease or leasehold.

---

## In re DUKE et al.

(District Court, E. D. Missouri, E. D. March 12, 1924.)

No. 3922.

1. **Bankruptcy** ⬅484—**Receiver, completing cloth caps, in process of manufacture, held not entitled to double compensation as "conducting the business" of bankrupt (Bankruptcy Act, § 48e [Comp. St. § 9632]).**

Receiver for a bankrupt cap company, who was authorized to, and did, complete certain cloth caps in process of manufacture when he took charge, *held* not to have been "conducting the business" of bankrupt, within the meaning of Bankruptcy Act, §§ 2(5), 48e (Comp. St. §§ 9586, 9632), and not entitled to double com-

pensation, but only to that of an ordinary receiver, under section 48d (Comp. St. § 9632).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conduct.]

## 2. Bankruptcy ⬛484.

"Business of a bankrupt is conducted" by a receiver within the meaning of Bankruptcy Act, §§ 2(5), 48e (Comp. St. §§ 9586, 9632), only when he carries on, at least substantially, the usual, customary, and normal activities of bankrupt.

In Bankruptcy. In the matter of Samuel Duke and others, partners doing business as the Duke Cap company, and as individuals, bankrupts. On review of order of referee. Affirmed.

Referee Walter D. Coles filed the following opinion on the application of the receiver for allowance of compensation:

"The Bankrupt Act, section 48, paragraphs (d) and (e), being Comp. St. § 9632, specifies three classes of receivers in bankruptcy and fixes the maximum compensation which each class can be allowed. Thus a different maximum compensation is provided for (1) a 'mere custodian'; (2) an ordinary receiver; and (3) a receiver who 'conducts the business.' In each class of cases the court in its discretion may allow less, but cannot allow more, than the prescribed maximum.

[1] "In the present case the receiver insists that he is a receiver who was authorized to, and did in fact, 'conduct the business' of the bankrupts, and that under the facts presented he should be allowed the maximum commission permissible, under the statute in such cases; that is to say, twice the commissions of the 'ordinary receiver.' It is conceded that, in general, the present receiver performed merely the duties which ordinarily devolve upon a receiver in bankruptcy, but in addition to the usual and ordinary services he was authorized to, and did, complete the manufacture of certain cloth caps in process of manufacture when he took charge, and it is urged that in doing this he was 'conducting the business,' within the meaning of the statute, and is properly entitled to the maximum compensation permissible in the case of a receiver who 'conducts the business.'

"It must be borne in mind that the provisions of the statute prescribing the maximum compensation of receivers were enacted with a view to securing an economical administration of bankrupt estates, and the statute should be given a fair and reasonable construction in furtherance of the end sought to be accomplished. There is a natural tendency on the part of receivers to obtain maximum compensation, but those charged with the duty of administering the law must construe it fairly, with a view to securing that reasonable economy which it was the intention of Congress to secure. In applying the provision of the statute here in question we are aided but little by reported cases. The statute must be interpreted in accordance with the ordinary canons of construction.

[2] "In this context, I am of the opinion that the 'business is conducted by the receiver' where the receiver carries on, at least substantially, the usual, customary, and normal activities of the bankrupt as a going concern. In the case of a manufacturer of caps, the characteristic activities of the business as a going concern are the purchase of the materials, the manufacture of the product, its sale to customers in the usual course of business, the keeping of the essential books and records, and the collection of the accounts. I am not prepared to say that all these activities are in all cases essential in order to justify the conclusion that the business is being 'conducted' by the receiver within the meaning of the statute; but, if any of these activities can be dispensed with, it would be in a case where they would under the circumstances be usually omitted by a going concern. For example, if there were ample raw materials on hand, it might not be necessary to purchase materials in order to keep the business going in the customary way.

"In the present case the receiver performed the usual services of an 'ordinary receiver,' and he also employed two of the bankrupts and a few other employees, who worked for a short time to finish certain caps in process of manufacture. This was necessary in order that the caps might be sold as finished caps, rather than pieces of cloth. No caps or other property of the bankrupt were sold by the receiver in the ordinary course of trade, but all the bankrupt's property was sold through an auctioneer at a public auction. Of course, 'an ordinary receiver' is customarily called upon to engage in some of the activities of a going concern, such as the insuring of the property, the collection of outstanding accounts, etc.; but, if the fact that he does some of the things customarily done by a going concern constitutes 'conducting the business,' there remains no scope for the activities of the 'ordinary receiver,' and the classes of receivers would be reduced to two, namely, 'mere custodians' and a receiver 'conducting the business.'

"In the instant case, I do not think the receiver was authorized to, or did in fact, per-

form such services as entitles him to be treated as a receiver who 'conducted the business' of the bankrupts, within the meaning of section 2, clause 5, and section 48, paragraph (e) of the Bankrupt Act (Comp. St. §§ 9586, 9632). The reported cases tend, I think, to support the view here taken. Matter of Shiebler & Co., 174 F. 336, 98 C. C. A. 208. In re Knosher & Co., 197 F. 136, 116 C. C. A. 560.

"In accordance with these views, I have entered an order allowing the receiver, as compensation for his services, the sum of $254.04, which is the maximum commission permissible in the case of an ordinary receiver."

Verne Lacy and Chas. J. Riley, both of St. Louis, Mo., for petitioning creditors.

Joseph Kane, of St. Louis, Mo., for bankrupt.

Stern & Burnett, of St. Louis, Mo., for receiver.

FARIS, District Judge. The petition for review herein is denied, and the order of the referee confirmed, for the reasons given by the referee, which reasons are adopted as the opinion of the court.

---

## FELDMAN v. AMERICAN PALESTINE LINE, Inc.

### THE PRESIDENT ARTHUR.

(District Court, S. D. New York. July 16, 1926.)

Receivers ⬥154(1)—Court having taken possession of vessel in creditor's suit, compensation and expenses of receiver and counsel held payable from proceeds of sale as against claimants of maritime liens.

A vessel was seized in a creditor's suit in equity against the owner, and possession taken by the receiver. Afterward the court permitted libels to be filed against the vessel in admiralty by lien claimants and process served, and possession was held thereafter by him and the marshal jointly. Expenses were incurred by the receiver in the repairing and care of the vessel, all of which were necessary and valuable for its preservation. Valuable services were also rendered by his counsel. By order of the court, the vessel was sold by the receiver and marshal jointly. Held, that the expenses of the receiver, his compensation, and fees of his counsel, were allowable from proceeds of the sale as having priority over claims of the maritime lienors.

In Equity. Suit by Morrison J. Feldman against the American Palestine Line, Inc. Also admiralty suits, consolidated therewith, against the steamship President Arthur. On motion of the receiver in the equity suit for allowances to him and his counsel for services and disbursements from the fund realized from sale of the vessel. Motion granted.

This is a motion for allowances out of the proceeds of the sale of the President Arthur, now in the registry of the court, to the receiver and his counsel for their services and disbursements in connection with the custody, care, and sale of the vessel.

Lampke & Stein, of New York City (Chauncey E. Treadwell, of New York City, of counsel), for receivers.

Carter & Phillips, of New York City (Peter S. Carter, of New York City, of counsel), for master and other officers of the steamship President Arthur.

Haight, Smith, Griffin & Deming, of New York City (Stanley W. Schaefer, of New York City, of counsel), for Tietjen & Lang Dry Dock Co. and Todd Dry Dock Engineering & Repair Co.

THACHER, District Judge. On September 11, 1925, Lawrence S. Greenbaum was appointed receiver in equity of American Palestine Line, Inc., in the above-entitled equity cause, which is the usual creditors' bill. The American Palestine Line was the owner of the steamship President Arthur, a trans-Atlantic passenger steamer of about 20,000 tons' displacement. At the time of the receiver's appointment she was on the high seas bound for New York. On her arrival at quarantine on September 15, 1925, the receiver took possession and from that moment she was and remained in the custody of the court. Prior to her arrival in port, libels had been filed in this court. No process thereon, however, was served until after the receiver had taken possession. On the following day, September 16, 1925, with the permission of the court, the marshal served process under a libel theretofore filed, and thereafter the court permitted the filing of other libels. There has been no order entered permitting or directing the marshal to interfere with the custody of the receiver, except that with the permission of the court process upon various libels has been issued to and served by the marshal. There has been no controversy in regard to the right of the marshal or the receiver to the exclusive possession of the ship. Her care and custody has not been exclusively intrusted to either, and the orders which have been entered from time to time, both in the equity and in the admiralty cause, have recognized a joint control of the vessel by the receiver and the marshal. From these orders no appeals were taken. Maritime lienors have been permitted to file their libels against the ves-