In re STUNZI, U. S. A., INC., f/k/a and a/k/a Bernson Mills, Inc., Debtor.

Bankruptcy No. 579–00294–H.

United States Bankruptcy Court, W. D. Virginia, Lynchburg Division.

Nov. 25, 1980.

Sherwood S. Day, Lynchburg, Va., trustee.

Robert M. Musselman, Charlottesville, Va., and Alexander W. Bell, Lynchburg, Va., for petitioning creditors.

W. Tracey Shaw, Lynchburg, Va., for Chase Manhattan Bank.

J. C. Crumbley, III, Lynchburg, Va., for debtor.

## MEMORANDUM OPINION AND ORDER ON PRIORITY OF AND STATUTORY LIEN FOR EMPLOYEES CLAIMS.

PHILIP H. HICKSON, Bankruptcy Judge.

Pursuant to order entered November 10, 1980, this proceeding came on to be further heard upon issues (1) and (2) stated therein. From the testimony of witnesses and written exhibits introduced, findings of fact and determination of issues presented are made by this memorandum opinion and order.

THE ISSUES:

(1) In the absence of a formal written objection, are the claims filed by employees proper for allowance, as filed?

(2) Are the allowed claims of employees entitled:

(a) To priority under § 507 of the Bankruptcy Code; and/or

(b) To priority under the Laborer's Lien under Virginia Code § 43–24 and § 43–25?

Considering Issue (1), the Trustee timely filed written objections to the claims filed by the petitioning creditors (representing the employees of the debtor as a class), hereinafter referred to as "employees".

Thereupon, counsel for employees filed a Motion to Strike the Trustee's objections. Counsel were heard in argument and after inspection of the written objections, the Motion was sustained for failure to furnish particulars of objection as required by Bar Order entered November 10, 1980, embodying the following requirements:

"That any entity or person objecting to the claims of either or any or all of the petitioning creditors/former employees of Stunzi, U.S.A., Inc., f/k/a and a/k/a Bernson Mills, Inc., file written objection with this Court, with full particulars thereof, on or before the 21st day of November, 1980, or forever thereafter be BARRED from making objection to any such claim. If any objection to said claims is filed, the same will be heard at 10:00 o'clock, a. m., on November 24, 1980, . . ."

By inspection of the Trustee's objections, it was determined that in the main they were directed toward the requirement of strict compliance with State statute for creation of an employee's labor lien, and to qualify for the wage priority provided under the Bankruptcy Code; to eliminate allowance of duplicate claims; and to require strict compliance for allowance of vacation and severance pay included within the wage claims as entitled to priority. Proof of such special rights, if claimed, are not waived or excused by the Bar Order and are not intended to be included in the requirements of objection thereunder. It is the obligation of the claimants to qualify for statutory labor lien and/or wage priority by the introduction of evidence. Consequently, the Motion to Strike the objection as to the claims filed was sustained as not directed toward the validity or entitlement of any claimant to wages earned and unpaid. The separate claims filed by employees are accordingly ALLOWED as to unpaid wages earned. Entitlement to vacation pay and severance pay is now separately considered.

Attached to "Employee's Exhibit A–1–a" is copy of Article VII, entitled "Vacations and Vacation Pay" of the collective bargaining agreement between debtor and

Local 65, Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC. This article of the collective bargaining agreement provides, in pertinent part, as follows:

"B. All employees who have been in the employ of the Employer for a period of five (5) years on June 1st and have worked a minimum of five hundred twenty (520) hours during the preceding twelve (12) months shall be granted a vacation of two (2) weeks with vacation pay equal to four percent (4%) of the total earnings of such employee during the preceding twelve (12) months. If such employee shall have worked nine (9) months or more during such period, he shall be guaranteed at least eighty (80) hours' vacation pay.

In like manner, the agreement provides that employees with fifteen (15) years service and five hundred twenty (520) hours work in the preceding year shall be granted three (3) weeks vacation pay equal to six percent (6%) of total earnings, and for those who have worked only six (6) months, two percent (2%) of their total earnings for vacation pay.

Further, the agreement provides:

"E. Any employee who is qualified as above provided but who quits or is discharged after June 1st, but before his vacation period, shall nevertheless receive the vacation pay to which he is entitled. Any employee who quits or is discharged prior to June 1st shall not be considered as being on the payroll and shall not be entitled to receive any vacation pay."

The uncontradicted evidence was that the superintendent representing debtor, on April 4, 1979, communicated with the representative of the union that he had received notice from the debtor's executive office in New York City to give notice of the decision of the debtor to cease and terminate manufacturing operations at debtor's plant and accordingly he had called a meeting of the employees upon the three (3) work shifts to give notice of the immediate cessation of plant operation. With that notice the employment of all employees was terminated, except a special few who performed temporary duties for the closing of the plant and protection of assets. It was argued by the Trustee that vacation pay accrued only for those "who are on the active payroll on June 1, and who have worked ten hundred forty (1040) hours or more since the previous June 1," as provided in Article VII, paragraph D. of the collective bargaining agreement. As these employees were discharged April 4, 1979, they were excluded from entitlement to vacation pay under subsection E. of said article, providing: "Any employee who quits or is discharged prior to June 1st shall not be considered as being on the payroll and shall not be entitled to receive any vacation pay."

The plant closing and termination of employment was the unilateral act of the employer, through no fault of and for no cause given by the employees. Except that the plant closing occurred prior to June 1, there is no ground for denial of vacation pay earned and claimed by the employees. It is significant to note there is no basic distinction between vacation pay and other wages earned by employees for services. It was pointed out by the witness that the vacation pay received by an employee was included within the total of earned wages shown upon the W–2 form for each employee and accordingly reported by the employer for tax purposes. If the worker has qualified for a full vacation pay allowance by the required minimum of fifteen (15) years prior employment and five hundred twenty (520) hours service during the preceding twelve (12) months or, in this instance ten (10) months, since the preceding June 1, may he be denied his earned vacation pay because of the literal provision pertaining to discharge of employee within the labor contract?

There is no separate provision within the contract pertaining to permanent plant shutdown. The effect of the permanent shutdown of employer's plant is considered in Am.Jur.2d where cases reaching opposite decisions are collected with comment. There are cases holding that under a collective bargaining agreement establishing an eligibility date on which an employee must

be employed in order to be entitled to vacation benefits, an employee prevented from satisfying this requirement because of the permanent termination of plant operations before the eligibility date has been held not entitled to vacation pay. Also, permanent termination of a business before a specified date has been held to render the employees ineligible for vacation pay, on the ground that the specified date is an eligibility date which must be satisfied factually. This is a court of equity, and such narrow construction of a labor agreement providing for compensation for services actually rendered in the form of vacation pay does not seem to satisfy the cardinal principle of equity or fair play by distorting the intent of the agreement in such a manner. To take a clause out of the contract which was not incorporated therein to cover the instance of a permanent plant shutdown is to take it out of context. The more satisfying reason to this court is the following statement in the text:

"On the other hand, a collective bargaining agreement establishing June 1 as the vacation pay calculation date has been held not to mean that only those employed on June 1 are entitled to vacation pay; consequently, employees qualified by length of service were held entitled to vacation pay under the agreement even though permanently terminated in January when the employer ceased all operations. Similarly, employees discharged before June 1 because of the employer's permanent shutdown of his business for economic reasons have also been held entitled to vacation pay under an agreement providing for vacation pay to 'all employees who on . . . June 1' have specified continuous service with the employer. A vacation clause providing vacation benefits to certain employees 'provided they are employees of the office at the time of taking their vacation' has been held intended to prevent an employee who quits from claiming a vacation allowance, and not to prevent employees from securing vacation benefits merely because their employer went out of business before they took their vacations and therefore they were not technically 'employees of the office at the time of taking their vacation.'"

48A Am.Jur.2d, Labor and Labor Relations § 1829, p. 272.

The appellate court in reviewing the trial court's denial of vacation pay under a contract having different provisions from that before this Court, turned to the general rules of contract law as the particular to be followed for decision upon such an issue as we have here. The Court stated:

"Even assuming the company's argument that the anniversary date was an inexorable condition of eligibility for vacation, we find critical the fact that it was the action of the company itself which made impossible the satisfaction of this condition. This situation is covered fully by Professor Corbin:

'The occurrence of the event is eliminated as a condition if it is prevented by the fault of the promisor—either as a breach of an actually implied promise, by intentional action to avoid having to pay, or by wrongful negligence. This is true even if the contract is aleatory; the promisor must not wrongfully increase the risk carried by the promisee." 6A Corbin, Contracts § 1362, p. 509 (2d ed. 1962).

"Similarly, the First Restatement on Contracts § 415 (1932), declares:

'A duty under a unilateral or independent contractual obligation * * * is discharged by a manifestation by the obligee to the obligor, at or before the time when performance is due, of unwillingness to receive the performance when due. * * *'

"This doctrine has not been lost on labor arbitrators themselves. In one of the earlier cases on this point, *Mays Landing Water Power Co.*, 12 L.A. 861 (1949), the arbitrator, in awarding vacation pay for workers left unemployed by reason of a plant shutdown, observed:

'[B]y shutting down plant operations the Company has made it impossible for union members to perform under the agreement. * * * This represents

abrogation of contract by preventing or hindering performance by the other party. When one party to a contract prevents or hinders performance requisite under the contract for the creation or continuance of a right in favor of the other party, the party initiating the preventing or hindering act is properly liable. * * *' Id. at 863.

"[2] Thus it appears that the company's unilateral action in closing down the plant, which is effectively a refusal to accept the proffer of continued performance on the part of the employees, removes the obligation of working until their anniversary dates, even if it is viewed as a material part of the contract."

*Local Union # 186, etc. v. Armour & Co.*, 446 F.2d 610, 614–15 (6 Cir. 1971). Upon that authority the judgment of the lower court was reversed and judgment entered allowing vacation pay.

■ It is accordingly determined that those employees qualified by service for vacation pay may not be denied their claim for earned vacation pay by reason of the permanent plant shutdown and such part of the claims is proper for allowance.

No objection was made to the claim for severance pay and the same is determined proper for allowance upon the principles above–stated relating to vacation pay.

■ Evidence was introduced that included in some of the wage claims filed by certain employees is an aggregate sum of $2,112.55 representing authorized deductions from wages for bond purchases. Like the balance of such final wages earned, bonds were not purchased and have not been delivered to the employees entitled thereto. The Trustee objects to allowance of any amount authorized to be deducted for bond purchase as not being wages. The objection by the Trustee is DISALLOWED for the reason that the employer failed to execute the authorization for deduction of wages for bonds purchase and the same remains as an unsatisfied claim for wages.

Considering Issue (2), as stated above, § 507 of the Bankruptcy Code provides:

"(a) The following expenses and claims have priority in the following order:
. . . .

\*      \*      \*      \*      \*      \*

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual."

■ It was the argument by the Trustee that the vacation pay was not earned within ninety (90) days before the filing of the bankruptcy petition or the date of the cessation of debtor's business, whichever occurs first, as required for the wage priority. It is provided in Article VII–A of the collective bargaining agreement above quoted, that all employees who had been employed for one year on June 1 and worked 520 hours during the preceding 12 months shall be granted vacation pay equal to a percentage of their total earnings during the preceding 12 months. Counsel for employees contend that vacation pay is not earned until an employee has qualified by a term of service and a minimum of 520 hours worked. Then, if employed June 1, he becomes entitled to vacation pay, which is the date vacation pay is earned. The Court agrees for the reason that the collective bargaining agreement makes no provision for apportioning the vacation pay by working fewer than the minimum hours. In this instance the plant closed April 4, 1979, and the employees actually worked the minimum of 520 hours between January 1 and April 4, 1979. By amendment between parties August 1, 1977, it was provided an employee who was *not* on the active payroll June 1 and had worked 1040 hours during the preceding 12 months shall be entitled to vacation pay. This revision does not affect the claims of employees remaining on the

active payroll at the time of the permanent plant shutdown. To deny the claim for earned vacation pay under the work record during three months immediately preceding the plant shutdown would be most unreasonable and not consistent with provisions of the agreement. The employees were on April 4, 1979, qualified and entitled to receive on June 1 vacation pay. They were prevented from "earning" the vacation pay by employment on June 1 through the unilateral action of the employer. Consequently, it is held they earned their vacation pay upon shutdown of the plant, which was within 90 days before the date of the cessation of debtor's business. All wages owing and unpaid employees were, in fact, also earned within 90 days of the plant shutdown, including severance pay. It is determined that the entire claims of employees, for money wages, for authorized deductions for bonds not purchased and delivered, vacation pay, and severance pay qualify and are entitled to priority under § 507(a)(3) of the Bankruptcy Code as wages.

Finally, the claim by employees to priority under the Laborer's Lien, stated in Issue (2)(b) above, under Virginia Code § 43–24 and § 43–25 is considered. Virginia Code § 43–24 provides that persons who furnish their services or labor to anyone engaged in manufacturing shall have a prior lien on the assets of such entity for their wages. The qualification of the employees for such laborer's lien was not challenged by the Trustee, but the perfection in accordance with the requirements of Virginia Code § 43–25 was challenged, which provides:

"No person shall be entitled to the lien given by the preceding section (§ 43–24) unless he shall, within ninety days after the last item of his bill becomes due and payable for which such supplies are furnished or service rendered, file in the clerk's office of the circuit court of the county or corporation court of the city in which is located the chief office in this State of the company against which the claim is, ..., a memorandum of the amount and consideration of his claim, and the time or times when the same is,

or will become due and payable, verified by affidavit, ..."

It is the contention of the Trustee that employees did not within 90 days after the last item of his bill became due and payable for which his services were rendered, file in the Clerk's Office the required memorandum. The Court concurs with the Trustee. The employer/debtor assembled the employees April 4, 1979, and notified them personally, and also notified their union representative, of the decision by the management of the debtor to permanently close the manufacturing plant. Thereupon, the obligation of the debtor to pay the wages and fringe benefits then owing employees became due and payable. The action of the debtor accelerated the obligation to pay wages earned by employees and the same became due and payable April 4, 1979, upon discharge of the employees. The first memorandum of labor lien was filed August 3, 1979, and amendment of the memorandum of labor lien was subsequently filed August 16, 1979. The filing date was not timely within the 90 days after the wages became due and payable to employees and they have not qualified for such statutory lien.

Accordingly, it is

### ORDERED:

That wage claims of employees as filed are ALLOWED and the same are granted priority of payment under Bankruptcy Code § 507(3) and shall include wages, deductions from wages for purchase and delivery of savings bonds, accrued vacation pay and severance pay; and the objection thereto by the Trustee is DISALLOWED; and

It is further ORDERED that the statutory lien under Code of Virginia §§ 43–24 and 43–25 to secure payment of wage claims of employees upon assets of debtor is DISALLOWED.