### In re BODIN APPAREL, INC., Giamo, Inc., Debtors.

Bankruptcy Nos. 81 B 12315, 81 B 12316.

United States Bankruptcy Court, S.D. New York.

Feb. 11, 1985.

**556**

Angel & Frankel, P.C., New York City, for debtor; Stuart I. Gordon, New York City, of counsel.

Max Zimny, New York City, for ILGWU Health Fund; Seth Kupferberg, New York City, of counsel.

BURTON R. LIFLAND, Bankruptcy Judge.

This opinion addresses a situation created by the continued existence of a corporate debtor during a period of metamorphosis. Although Bodin Apparel, Inc. ("Bodin") began its existence as a clothing manufacturer, it gradually eliminated its manufacturing and clothing related activities before commencing its post-reorganization activities as an investment or acquisition vehicle.[1] Although dormant at one point for most purposes, Bodin insists it never ceased existence as a business enterprise. The precise question presented by Bodin's motion to reclassify the ILGWU Southeast Region Health and Welfare Fund's ("the

Fund") claim is what constitutes "cessation of business" as that term is used in § 507(a)(4) of the Bankruptcy Reform Act of 1978 ("the Code") so as to entitle a claim for contributions to an employee benefit plan to a priority. Based on the express legislative intent behind that section, it is clear to this Court that such an analysis should be undertaken from the viewpoint of the statutorily intended beneficiary, the employee workforce.

## I. FACTUAL BACKGROUND

Bodin[2] filed a petition for reorganization under chapter 11 of the Code on November 23, 1981. A creditor, the Fund, claims that employee benefit plan contributions owed to the Fund by Bodin should be granted priority status under § 507(a)(4) of the Code. Under that section a priority claim for contributions to an employee benefit plan must have "aris[en] from services rendered within 180 days before the date of filing of the petition or the date of the cessation of the debtor's business, whichever occurs first." *Id.* It should be noted that the section contains no limitation on its reachback application, i.e., cessation of the debtor's business could have occurred within 90 days or years before the filing date.

The parties stipulated the following facts:

The Fund is an employee benefit plan within the meaning of § 507(a)(4) of the Code. It has an unsecured claim for contributions in the amount of $224,137.68 which is based upon a valid, final and binding arbitration award against Bodin. The Fund alleges that $44,857.01 of its claim is entitled to priority status because it arises from services rendered to Bodin by employees covered by the Fund during the one

---

1. During this transitional period Bodin's activities included shipping its remaining merchandise; liquidating its physical assets; filing a petition for reorganization under the Code; confirming a plan of reorganization that provided for the merger with other entities; and emerging from chapter 11 with its name changed. Except for a possible twelve million dollar operating loss carryforward, the entity once known as Bodin Apparel, Inc. no longer exists.

2. At the commencement of this case, Chapter 11 petitions were filed both by Bodin and by its wholly-owned subsidiary Giamo, Inc. Both debtors utilized one central bookkeeping system, and their assets and liabilities have been merged. By order of this Court dated July 6, 1982, the two cases were consolidated for procedural purposes pursuant to Bankruptcy Rule 117. Hereinafter, "Bodin" will refer to the consolidated case.

hundred eighty day period prior to Bodin's cessation of business.

Until November, 1980, Bodin's principal business activity was the design, manufacture and sale of coordinated contemporary sportswear. Bodin curtailed all design and manufacturing operations as of November 3, 1980. For approximately the previous ten months, it had been conducting a scaled-down operation and a program of disposing of assets. Bodin finalized the sale of its main manufacturing facility and substantially all of its machinery before July 31, 1980, and sold its remaining land, building, property, plant and equipment thereafter. From November, 1980 through the filing of its bankruptcy petition, Bodin's main function was the liquidation of tangible assets and reorganization of its business. Although Bodin's records are insufficient to determine the extent or exact nature of the activities performed, it appears that Bodin ceased performing major functions ancillary to its clothing manufacturing activities approximately during the months indicated:

| | |
|---|---|
| Manufactured clothing | September, 1980 |
| Received material for manufacture into clothing | October, 1980 |
| Maintained facilities for the production of clothing | October, 1980 |
| Shipped finished goods | December, 1980 |

Bodin's gross payroll declined markedly in the months between April, 1980 and March, 1981 from a high of $377,049 in April, 1980 to $10,441 in February, 1981. The reduction was especially drastic between October and November, 1980, when the gross payroll fell from $142,457 to $65,262.

The Fund contends that the "cessation of the debtor's business" occurred in September, 1980, the last month in which Bodin manufactured any clothing. By Proof of Claim filed in January, 1982, it seeks priority status for that portion of its unsecured claim arising from services rendered to Bodin between April 30, 1980 and September 30, 1980.[3]

In the alternative, the Fund contends that the cessation of Bodin's business took place in October, 1980 (when Bodin curtailed all production), in which case the Fund's claim would be reduced to $32,964.98 (covering contributions arising from services rendered between May, 1980 and October, 1980), or, that the cessation occurred in December, 1980 (the last month in which Bodin shipped finished goods), in which case the Fund's claim would be reduced to between $15,896.58 and $23,463.04 (covering contributions arising from services rendered from some time in June, 1980 through December, 1980).

Bodin also advances alternative arguments. First, it contends that its continuous existence belies any cessation of business. Next it asserts that the trigger date for determining the status of the Fund's claim is the date Bodin filed its bankruptcy petition. Although Bodin's principal business activity was the design, manufacture and sale of sportswear, it asserts that the activities it was engaged in between November, 1980 and November 23, 1981 (namely, disposing of its few remaining assets, seeking opportunities to reorganize, settling debts, claims, lawsuits and arbitration proceedings and maintaining books and records) constituted doing business. Bodin states that no portion of the Fund's claim is entitled to priority status because no portion of it arose during the one hundred eighty days prior to the filing of the petition.

Finally, Bodin argues that if the Court determines that a cessation of its business occurred prior to the date it filed its petition, the only possible date of cessation is March 31, 1981, the date following which it retained only one employee. If this is so, contends Bodin, then no priority exists be-

---

**3.** Specifically, the value of the services rendered during this time are the as follows:

| MONTH | AMOUNT |
|---|---|
| April 1980 | $11,892.03 |
| May 1980 | 9,501.94 |
| June 1980 | 7,566.46 |
| July 1980 | $ 4,565.32 |
| August 1980 | 8,939.34 |
| September 1980 | 2,391.92 |
| TOTAL | $44,857.01 |

cause no employees covered by the Fund were employed during the period one hundred eighty days prior to March 31, 1981.

For the following reasons, the Court determines that a cessation of Bodin's business within the meaning of § 507(a)(4) of the Code occurred by October 31, 1980, the last day of the month in which it maintained facilities for the production of clothing.

## II. DISCUSSION OF LAW

Although the meaning of the phrase "cessation of the debtor's business" appears facially clear, there is a paucity of cases construing it for purposes of determining priorities under the Code.

■ It is a fundamental canon of statutory construction that a court must be guided by the plain meaning of the statute as well as by Congress' intent in enacting the statute. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). In *In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 75 (2d Cir. 1984), the court stated: "Where ... the statutory language clearly expresses the congressional intent, a court may not read another meaning into the statute in order to arrive at a result which the court deems preferable." *Id.* at 75 (citations omitted). However, in its discussion of statutory interpretation engendered by three cases arising under "private civil RICO" (Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982)), the Second Circuit noted that where statutory language is ambiguous it must "be construed in light of Congress' purpose in enacting it." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482, 488 (2d Cir.1984) citing *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). *See also United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (quotation omitted), *cited in Sedima* at 488 n. 17; *Bankers Trust Co. v. Rhoades,* 741 F.2d 511, 517 (2d Cir.1984); *Furman v. Cirrito,* 741 F.2d 524, 527 (2d Cir.1984); Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.

Rev. 527, 528 (1947). Examination of Congressional intent as determined by reference to the legislative history of § 507(a)(4) makes it clear that a cessation such as that contemplated by the statute occurred in this case no later than October 31, 1980.

### A. *The Legislative History*

Section 507 of the Code specifies the kinds of claims that are entitled to priority in distribution, and their order of priority. The leading bankruptcy treatise states that the order of priorities in Code § 507 is not susceptible of judicial rearrangement. 3 *Collier on Bankruptcy,* ¶ 507.02 at 507–17 (15th ed. 1979) (hereinafter *"Collier"*). Prior to the enactment of the Code, there existed no priority for claims for contributions to employee benefit funds. Although individual employees' claims for wages earned during the ninety days pre-petition were entitled to priority under the former Bankruptcy Act, 11 U.S.C. § 64(a)(2) (repealed 1978), contributions to employee benefit funds were held not to be "wages" within the meaning of the Act, and therefore were not entitled to priority status. *See United States v. Embassy Restaurant, Inc.,* 359 U.S. 29, 33–34, 79 S.Ct. 554, 556–57, 3 L.Ed.2d 601 (1959). Insofar as it granted priority status to wages, the former Bankruptcy Act made the date the debtor filed its petition the critical date for computing the amount of wage priority. *See, e.g., Strom v. Peikes,* 123 F.2d 1003, 1005 (2d Cir.1941).

The drafters of the Code intended § 507(a)(4) specifically to overrule *Embassy Restaurant. See* S.Rep. No. 989, 95th Cong., 2d Sess. 69 (1978); H.R.Rep. No. 595, 95th Cong., 1st Sess. 187 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787. The legislative history to the Code's priority provisions dealing with wage claims (§ 507(a)(3)), and claims for employer contributions to benefit funds (§ 507(a)(4)) indicates that the "cessation of business" language was added to both sections to provide additional protection to the employees of a bankrupt enterprise. H.R.Rep. No. 595 at 187–88. The *Report Of The Com-*

*mission On The Bankruptcy Laws Of The United States*, H.R.Doc. No. 137, 93rd Cong., 1st Sess., Pt. 1, 214 (1973) ("Commission Report") accompanying an early draft of the priority sections noted that for purposes of determining wage and fringe benefit priorities, "the use of the date of the petition as the date from which the critical period is measured is not always fair." *Id.* (footnote omitted). Thus, as to wages, the "cessation of business" language "was added to protect employees whose employer stops paying them, or pays them at a reduced rate, and goes out of business, but then waits longer than ninety days to file a bankruptcy petition." *Id.* at 232 n. 217 ("present Act is arbitrary ... in using the petition as a measuring date"); *In re Davidson Transfer & Storage Co.*, 41 B.R. 805, 807 (Bankr.D.Md.1984).[4]

The rationale is not different in the case of fourth priority claims for contributions to employee benefit funds. By including the provision in § 507(a)(4), Congress likewise sought to protect employees by ensuring that employers could not escape priority claim liability by waiting more than one hundred eighty days from the time liability for contributions ceased to accrue to file a bankruptcy petition. Thus, the phrase "cessation of the debtor's business" should be construed broadly to further this Congressional purpose. *Davidson*, at 807. To interpret the phrase as Bodin urges would frustrate the intent of Congress by denying priority status to claims that Congress contemplated would come within the ambit of the fourth priority provision.

By overruling *Embassy*, Congress indicated its intent to treat contributions to employee benefit plans as wages, thereby entitling such contributions to a priority to the extent that they accrued within the

statutorily-prescribed time frame. Taking the explicit Congressional direction literally, to hold that this debtor ceased its business for the purposes of the statute only when it filed its petition, would frustrate the announced legislative intent to afford employees' wages greater protection.

**B. Cessation of the Debtor's Business**

The quantum of business activity necessary to support a legal conclusion that a debtor is "doing business" is not immediately clear. In 18 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, (rev. perm. ed. 1983) it is noted that:

> What is meant by doing business ... is something approached from so many angles that the subject appears a mass of confusion. 'Doing business for purposes of taxation, doing it within a statute requiring licenses, and doing enough business to justify the service of process are quite different things.... [T]he degree of activity ... which is required varies according to the purpose for which ... [a] ... corporation is sought to be subjected to [a particular statute].

*Id.* at § 8712. How little business activity qualifies as "cessation of business" for bankruptcy purposes under Code § 507(a)(4) is similarly difficult to determine.

Recently it has been held that "[t]he termination of a major division or subsidiary of a debtor is within the meaning of the statutory language specifying 'the cessation of the debtor's business'." *Davidson*, 41 B.R. at 807. The *Davidson* court noted that "[b]ecause a debtor may have more than one business, cessation of business does not come only when the last light is turned off in the debtor's last facility. Such a restrictive interpretation of the stat-

---

**4.** Bodin inappropriately cites *In re Lansdale Transportation Co., Inc.*, 11 B.R. 78 (Bankr.E.D. Pa.1981) and *In re Bighorn Fastener Co., Inc.*, 23 B.R. 243 (Bankr.D.Col.1982) in support of its contention that the Fund's claim is not entitled to a priority. In both cases, the court denied priority status to claims for vacation pay earned more than ninety days prior to the filing of the debtors' petitions. Rather than supporting Bodin's assertion that the Fund's claim in this case

is not entitled to priority, the harsh results obtained in *Lansdale* and *Big Horn* illustrate why the addition of the remedial language of §§ 507(a)(3) and (a)(4) was considered appropriate, and why, to the extent that the Fund's claim is attributable to services rendered to Bodin during the one hundred eighty days prior to Bodin's cessation of business, the claim *is* entitled to priority.

utory language would defeat the implicit Congressional purpose of protecting employees of the debtor." *Id.* (citation omitted). Thus, although the debtor in *Davidson* continued to operate other of its divisions, the termination of one division which affected the wages and benefits of that division's employees was held to be a "cessation" under § 507(a)(3) insofar as the wage and benefit claims of those employees were concerned.

In the instant case Bodin does not assert that any aspect of its clothing manufacturing activities continued after October 31, 1980. However, Bodin directs the Court's attention to a series of activities which were incidental to the corporation's final winding down, claiming that such activities served to forestall a cessation of business until the date Bodin filed its petition. In *In re Stunzi, U.S.A. Inc.*, 7 B.R. 401 (Bankr. W.D.Va.1980) the court found the cessation of the debtor's business to have occurred on the date when "the employment of all employees was terminated, except a special few who performed temporary duties for the closing of the plant and protection of assets." *Id.* at 403. The *Stunzi* court found the date of cessation to be the date when cessation logically occurred, i.e. the date when all employees necessary to the debtor's principal business activity were terminated. The fact that a few employees were retained to effectuate the liquidation apparently did not constitute conduct of the debtor's business to the *Stunzi* court. Similarly, the court in *Dryden v. Ranger Refining & Pipe Line Co.*, 280 Fed. 257 (5th Cir.), *cert. denied*, 260 U.S. 726, 43 S.Ct. 89, 67 L.Ed. 483 (1922) noted that "[t]he business of a corporation is its activities in the acquisition or production of that which its charter authorizes it to acquire or produce." *Id.* at 259.

Bodin's claim that it continued to do business during the period when it was finalizing its reorganization or liquidation plans is further weakened by examining the analysis used in cases dealing with conduct of the debtor's business by a receiver or by an operating trustee. Unarguably, conduct of

the debtor's business is the antithesis of cessation of the debtor's business.

In *Vass v. Conron Bros. Co.*, 59 F.2d 969 (2d Cir.1932) a receiver-trustee assumed a lease of the debtor who dealt in refrigerated products. The lessees of some refrigerator space sued him in his individual capacity for breach of contract, alleging that the receiver-trustee's failure to properly refrigerate their perishable goods spoiled them. In holding that a cause of action arising out of the trustee's conduct of the debtor's business did not lie against the trustee individually, the court stated:

> To 'carry on the business' is ... the same thing as to 'continue' it under section 2(5) of the [1898] Bankruptcy Act.... Merely to hold matters in status quo; *to make time, as it were;* to do only what is necessary to hold the assets intact; such activities, do not seem to us to be a continuance of the business.

*Id.* at 971 (emphasis added). Thus, under *Vass*, Bodin's finalization of its liquidation plans does not constitute conduct of the debtor's business. Indeed, in *Austrian v. Williams*, 216 F.2d 278 (2d Cir.1954), *cert. denied*, 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955) the court stated: "merely to attempt to collect and liquidate the assets of the debtor is not to carry on its business in any proper sense of the term." *Id.* at 285 (citation omitted). Finally, in *In re Beck Industries, Inc.*, 725 F.2d 880 (2d Cir.1984) the court noted that "an attempt to collect and liquidate the assets of a subsidiary would *a fortiori* not fall within [acts or transactions in carrying on business]." *Id.* at 887.

*Collier* notes that the authorization of a trustee under Code § 721 to operate the business of the debtor "would be appropriate, for example, for the operation of a watch company to convert watch movements and cases into completed watches." 4 *Collier*, ¶ 721.02 at 721–2. The example provided by *Collier* equates conducting the debtor's business with continuing the usual activities of the debtor to their completion. This is similar to Bodin completing its clothing manufacturing operations.

Applying the above to the case at bar, the Court finds that the only activities that Bodin was engaged in after October 31, 1980 contraindicate its continued operation in business. Rather than acquiring or producing, Bodin was engaged in liquidating. Activities incidental to the liquidation of a corporation do not constitute conducting business. *See Palmer v. Hoffman,* 318 U.S. 109, 111–12, 63 S.Ct. 477, 479–80, 87 L.Ed. 645 (1943) (railroad's business is railroading, not litigating). As in *Stunzi,* Bodin did not require the services of any of its former clothing production employees to conduct the activities it engaged in between November 1980 and November 1981. Indeed, after October 31, 1980, no employees covered by the Fund were employed by Bodin.

For purposes of determining whether a receiver was more than a mere custodian and therefore was entitled to additional compensation for "conducting the business" of the debtor, the court in *In re Duke,* 15 F.2d 92 (E.D.Mo.1924) stated:

> [T]he 'business is conducted by the receiver' where the receiver carries on, at least substantially, the *usual, customary, and normal activities of the bankrupt as a going concern.* In the case of a manufacturer ... *the characteristic activities of the business as a going concern are the purchase of the materials, the manufacture of the product, its sale to customers in the usual course of business, the keeping of the essential books and records, and the collection of accounts.*

*Id.* at 93 (emphasis added). In *Duke,* the receiver employed two employees of the debtor and a few other employees who worked for a short time completing unfinished pieces. Those pieces, along with the rest of the debtor's property, were eventually sold at a public auction. The sale of the property was held not to constitute doing business on the part of the receiver. Applying the *Duke* analysis to this case reveals that the last date on which Bodin's business could possibly have been conducted was October 31, 1980: Bodin last manufactured clothing in September, 1980 and it

last received material or maintained facilities for the production of clothing in October, 1980. The fact that it shipped goods in December, 1980 does not indicate Bodin was conducting business as a going concern. Indeed, after October 31, 1980 Bodin maintained no facilities for the manufacture of clothing. Rather, like the receiver in *Duke,* Bodin was merely liquidating what remained of its assets. *See also Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1091 (5th Cir.1980) (conducting business standard met where receiver-trustee involved himself in "the usual activities [of the business] as a going concern"); *In re United States Products Corp.,* 57 F.Supp. 239, 241 (N.D.Cal.1944) (where trustee's activities included collection of accounts, sale of assets, matters of insurance, taxes, inventories and investigations, *but not the purchase of fruit and vegetables or the canning and sale thereof,* the activities did not constitute the business of the debtor cannery).

*Conclusion*

The Court finds that Bodin ceased doing business within the meaning of Code § 507(a)(4) no later than October 31, 1980, during which month Bodin last engaged in its principal business activity. The Fund's claim is thus entitled to fourth priority status to the extent of $32,964.98, the amount attributable to services rendered to Bodin during the period one hundred eighty days prior to October 31, 1980. Bodin's motion to reclassify the Fund's entire claim is therefore denied.

It is so ordered.