**In the Matter of DANBORN CONTRACTING COMPANY, INC., Debtor.**

**Bankruptcy No. B84–00795–Y.**

United States Bankruptcy Court, N.D. Ohio.

Sept. 5, 1985.

James H. Beck, Canfield, Ohio, for debtor.

Richard Zellers, Youngstown, Ohio, for trustee.

Mark Webber, Cleveland, Ohio, for Central States Southeast and Southwest Area Pension Fund.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This matter is before the Court on the Trustee's objection to the claim of Central States, Southeast and Southwest Area Pension Fund, in the amount of One Thousand Seven Hundred Thirty-Nine & 44/100 Dollars ($1,739.44). Specifically, the Trustee has objected to the claim being allowed as a priority claim under 11 U.S.C. Section 507(a)(4). The Trustee has no objection to the amount of the claim or its being allowed as a general unsecured claim. Cen-

tral States has asserted that its claim should be given priority status pursuant to Section 507(a)(4) since the Debtor herein ceased employing members of Teamsters Local Union 377 prior to the filing of its Chapter 7 petition so that the time period for priority claims must be measured from a date prior to the filing of the petition. The parties are in agreement as to the facts and have agreed to submit the matter to the Court for a decision on whether Danborn's actions constitute "cessation of the debtor's business" within the meaning of 11 U.S.C., Section 507(a)(4).

## FACTS

The Debtor herein, Danborn Contracting Company, Inc., filed a Chapter 7 petition on August 15, 1984. It had been engaged in the business of doing repair work for concrete highways and bridges and, until January of 1984, had employed members of Teamster Local Union 377 to haul materials for its operations. Pursuant to a collective bargaining agreement between Danborn and the Union, Danborn had been obligated to pay pension contributions to the Central States Pension Fund on behalf of its eligible employees.

In January 1984, Danborn ceased employing union members to haul its materials and, instead, contracted the work out to independent agents. Danborn continued in the business of repair work until sometime after the filing of its Chapter 7 petition in August, 1984.

Central States' claim is in the amount of One Thousand Seven Hundred Thirty-Nine & 44/100 Dollars ($1,739.44). A portion of this amount, One Hundred Ninety-Two & 00/100 Dollars ($192.00), constitutes contributions owed prior to July, 1983. Central States is not asserting that this amount should be accorded priority status. Rather, Central States is arguing that the contributions owed from July 1983 to December 1983 in the amount of One Thousand Five Hundred Twelve & 00/100 Dollars ($1,512.00) plus accrued interest through July 24, 1984, in the amount of Thirty-Five

**10**

& 44/100 Dollars ($35.44), should be accorded priority status since Danborn ceased hiring union members as of January 1984. In essence, Central States is arguing that the cessation of operations covered by the collective bargaining agreement constitutes "cessation of the debtor's business" within the meaning of 11 U.S.C., Section 507(a)(4). We find no merit to this argument.

## DISCUSSION

11 U.S.C. Section 507(a)(4) states, in pertinent part:

> (a) The following expenses and claims have priority in the following order:
>
> .  .  .  .  .
>
> (4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—
> (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first. . . .

Thus, where a debtor ceases doing business prior to the filing of a petition, the 180-day period will be measured from the date upon which the debtor is determined to have ceased doing business. The purpose of the provision is to provide an extra measure of protection to employees whose employer stops employing them, goes out of business, but then waits to file the bankruptcy petition in order to defeat priority claim liability. *In re Davidson Transfer & Storage Co.*, 41 B.R. 805, 807–808 (Bkrtcy. D.Ma.1984).

Central States cites *In re Bodin Apparel, Inc.*, 46 B.R. 555 (Bkrtcy.S.D.N.Y.1985), in support of its argument. In *Bodin*, the debtor began its existence as a clothing manufacturer but gradually eliminated its manufacturing and clothing-related activities before commencing its post-reorganization activities as an investment or acquisition vehicle. Bodin had filed a Chapter 11 petition in November, 1981, but had finalized the sale of its main manufacturing facility and most of its machinery by July 31, 1980. From August, 1980, to the filing of the petition in November, 1981, Bodin's main function had been the liquidation of its tangible assets and the reorganization of its business. During that time, Bodin gradually eliminated most of its employees, retaining just a few for the sole purpose of liquidating the manufacturing business. The Court held that, although Bodin had never technically gone out of business in that they had retained employees on the payroll through the date of filing the Chapter 11 petition, the closing down of the manufacturing facility constituted a "cessation of the debtor's business" within the meaning of Section 507(a)(4). *Id.* at 561. In reaching its conclusion, the Court relied in part upon the decision in *In re Stunzi, U.S.A., Inc.*, 7 B.R. 401 (Bkrtcy.W.D.Va. 1980), wherein it was held that the date of cessation of the business was the date when all employees necessary to the debtor's principal business activity were terminated. *Bodin*, 46 B.R. at 560 (citing *Stunzi*, 7 B.R. at 403). The Court found that since Bodin had ceased its principal business activity prior to the filing of its petition, the priority period was to be measured from that date rather than the date Bodin filed its Chapter 11 petition.

We believe that *Bodin* is not controlling in this case. The debtor herein did not cease its principal business activity prior to the filing of its Chapter 7 petition. It was still engaged in the business of repairing concrete highways and bridges at least until the time of filing. The fact that it made a business decision to engage independent agents to haul its materials rather than to employ union members is of no consequence. We find that the actions of Danborn in ceasing covered operations did not constitute a "cessation of the debtor's business" within the meaning of Section 507(a)(4).

Our finding is supported by *In re Adcock Excavating, Inc. and Adcock Paving, Inc.*, 42 B.R. 84 (Bkrtcy.D.Ill.1984). In *Adcock*, the debtors had discharged many of their engineers in December of 1982 but had retained at least one engineer and had per-

formed jobs up until the filing of the Chapter 11 petitions on February 15, 1983, and afterwards. The Trustees of the Midwest Operating Engineers Fringe Benefit Funds had asserted that the time for determining which claims were entitled to priority should date from December, 1982, the date that Adcock had discharged substantially all of their engineer-employees. In finding that the debtors had not ceased doing business within the terms of Section 507(a)(4), the Court looked to whether the debtors had continued performing their usual work or had engaged in merely administrative or liquidation functions. *Id.*, at 86–87. "It seems to the Court that where a debtor remains in business, the concern that the employer has manipulated the priority period at the employees' expense is diminished." *Id.*

In this case, the parties acknowledge that the debtor continued performing its usual work at least until the time it filed its Chapter 7 petition. Therefore, the instant facts do not mandate a result similar to that reached in *Bodin*. We find that *Adcock* is more directly on point and that, despite the fact that Danborn had ceased employing drivers who were represented by Local Union 377, its actions do not constitute a "cessation of the debtor's business" within the meaning of Section 507(a)(4).

It is clear from the Court's analysis in *Adcock* that our focus should be on whether the business operations are continued, rather than on the persons who carried out the business operations.

The claim of Central States is allowed as a general, unsecured claim but not as a priority claim. The Trustee's objection is sustained.