**In the Matter of NAPCO GRAPHIC ARTS, INC., Debtor.**

**WISCONSIN DEPARTMENT OF INDUSTRY, LABOR AND HUMAN RELATIONS, Plaintiff,**

**v.**

**R Arthur LUDWIG, Trustee, Napco Graphic Arts, Inc.; Atlas Leasing Corp.; First Wisconsin Financial Corp.; Phillip K. Harvey, Agent; Defendants.**

**Bankruptcy No. 81–00587.**
**Adv. No. 81–1380.**

United States Bankruptcy Court,
E.D. Wisconsin.

July 16, 1985.

Jack U. Shlimovitz, Ludwig & Shlimovitz, S.C., Milwaukee, Wis., for R Arthur Ludwig, trustee.

Anne Willis Reed, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, Wis., for Phillip K. Harvey.

Thomas L. Shriner, Jr., Mark F. Foley, Milwaukee, Wis., for First Wis. Financial Corp.

Arthur Moglowsky, Bass, Goldstein & Moglowsky, S.C., Milwaukee, Wis., for Atlas Leasing Corp.

## MEMORANDUM OPINION

C.N. CLEVERT, Bankruptcy Judge.

This matter is before the court upon the filing of a complaint by the Wisconsin Department of Industry, Labor and Human Relations (DILHR) as assignee of pre-petition wage claims by the debtor's former employees. The complaint seeks relief under two separate causes of action. First, DILHR seeks entry of a declaratory judgment that the filing of notice of the wage earners' lien in the sum of $237,285.33 is not prohibited by the automatic stay imposed by 11 U.S.C. § 362(a) and that its lien is superior to the liens or interests of all of the defendants. In the second cause of action, DILHR alternatively seeks relief from the automatic stay to permit it to validly file the wage earners' lien and to commence a foreclosure action against the debtor's property.

The defendants in this action consist of R Arthur Ludwig, Napco's bankruptcy trustee (trustee); First Wisconsin Financial Corporation (FWFC), a secured creditor; Phillip Harvey, (Harvey), agent for other secured creditors; and Atlas Leasing Corporation (Atlas), Napco's equipment lessor.[1]

Pending before the court are numerous motions which the parties believe will be dispositive of this matter. And because the parties also agree that there are no genuine issues of material fact, the court

John W. Calhoun, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for DILHR.

1. M–D Investment was dismissed as a defendant by an earlier order of the court.

will consider their motions as it would cross motions for summary judgment.

On July 23, 1980, Napco held an option to purchase its leased premises which it assigned to Harvey. Napco further assigned the option to FWFC on August 29, 1980, to secure repayment of a $150,000 note. As a result, Harvey subordinated his interest in the option to purchase to FWFC. Ludwig was appointed trustee after Napco filed its petition under Chapter 7 of the Bankruptcy Code on March 2, 1981. He thereafter entered an agreement with Atlas Leasing to sell Napco's leased equipment free and clear of all liens and interests with any sums in excess of the balance due to Atlas to be held pending the further order of this court. Another agreement was reached with FWFC and Phillip Harvey for the sale of the option to purchase free and clear of all liens and interests pending a determination by this court of their rights to the proceeds. Notice of these agreements and the April 24, 1981, deadline for objecting to the trustee's proposed sales were sent to creditors. The sales were subsequently consummated after resolution of a dispute involving FWFC's claimed interest in the equipment.

From just prior to the filing of the petition until early April of 1981, Napco's former employees executed proofs of claim for wages [2] and other debts which they assigned in trust to Graphics Arts International Union Local 277 or its designee for collection. On October 21, 1981, the union in turn reassigned those claims, in trust, to DILHR for the purpose of enforcing the rights of the employees under WIS.STAT. § 109.09(2). Thereafter, on December 3, 1981, DILHR filed notice of a wage earners' lien in the total sum of $237,285.33 at the office of the Clerk of the Circuit Court for Waukesha County, Wisconsin, on behalf of sixty-eight of the debtor's former employees. The amounts claimed included earned wages, birthday pay, holiday pay, vacation pay, pension deductions, two weeks notice pay, and other deductions such as credit union payments and United Fund contributions.

The wage earners' lien was filed by DILHR on the basis of WIS.STAT. 109.-09(2) which provides that:

Pursuant to its authority under sub. (1) to take assignments of wage claims and wage deficiencies and to maintain actions for the benefit of employes, the department shall have a lien upon all property of the employer, real or personal, located in this state for the full amount of any wage claim or wage deficiency. Such lien shall take precedence over all other debts, judgments, decrees, liens or mortgages against the employer and may be enforced in the manner provided in ss. 409.501 to 409.507 and 779.09 to 779.12, insofar as such provisions are applicable. Any such lien shall exist as of the last date on which services were performed for the employer and for which wages are due and owing.

Although the motions pending before the court raise numerous issues for consideration, the critical issues appear to relate to the validity and avoidability of a lien created by WIS.STAT. § 109.09(2). More specifically, this court must decide the following questions:

1. Does WIS.STAT. § 109.09(2) establish a statutory lien on the debtor's property?

2. Is the lien valid under the Supremacy Clause of the U.S. Constitution? [3] and

3. If the lien is valid, may the lien be avoided under 11 U.S.C. § 545?

## I.

### STATUTORY LIENS

■ It is clear that a lien under WIS. STATS. § 109.09(2) is a statutory lien as defined in the Bankruptcy Code. Title 11 U.S.C. § 101(45) defines a statutory lien as a

---

**2.** Most of the wages were due to be paid in February, 1981.

**3.** U.S. CONST. art. VI, cl. 2.

lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependant on a statute and whether or not such interest or lien is made fully effective by statute.

Examination of § 109.09(2) reveals that it (a) authorizes wage assignments and the creation of a lien in favor of DILHR; (b) provides that the lien takes precedence over all other debts, judgments, decrees, liens, or mortgages against the employer; (c) sets forth enforcement procedures; and (d) provides the date the lien will arise. Thus, the creation of a lien pursuant to WIS.STAT. § 109.09(2) satisfies the Bankruptcy Code's definition of a statutory lien.

Bearing this in mind, the court will next attempt to determine whether or not § 109.09(2) conflicts with federal bankruptcy law and whether a lien which reportedly exists under this statute may be avoided under § 545 of the Bankruptcy Code.

## II.

### SUPREMACY CLAUSE

■ In determining the question of whether or not a state statute conflicts with a federal statute, the court must follow the two-step process of "first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Perez v. Campbell,* 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971). Thus, in this instance, the court must consider the construction of § 109.09(2); construction of relevant portions of the Bankruptcy Code related to the priority of claims and distribution to creditors; and then determine whether § 109.09(2) frustrates the Bankruptcy Code's priority scheme.

### A. Construction of § 109.09(2)

Wisconsin's appellate courts have yet to interpret § 109.09(2) and as such *Farmers*

*and Merchants Bank v. Terminal Electric, Inc. (Terminal),* 80 CV 1801 (Waukesha County Circuit Court, October 18, 1981) (see appendix) is the only known written decision discussing the statute; ergo, as a matter of comity, this court will avoid ruling on the constitutionality of the statute under Wisconsin law. *Thompson v. Magnolia Co.,* 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940). On the other hand, this court will examine the language and legislative history of § 109.09(2) in an attempt to ascertain its objectives.

Chapter 109 of the Wisconsin Statutes attempts to provide protection to persons who become unemployed and lose benefits due to business closings. The legislative history of Chapter 109, to the extent that such is available from the Wisconsin Legislative Reference Bureau, notes that creation of the statute was prompted by the closing of large industrial plants in various parts of Wisconsin during the early 1970's. A special committee on employee protection in business closings established by the legislative council on May 8, 1974, was directed to "consider statutory changes for the protection of persons who become unemployed and lose valuable benefits because of business closings, and to report its findings and recommendations to the Legislative Council." *Wisconsin Legislative Council Report No. 9 to the 1975 Legislature on Legislation Relating to Employee Protection in Business Closings, A.B. 595 Revising State Law Relating to Wage Payments, Claims and Collections, SLSC–RL–75–9,* Dan Furback, staff attorney, April 15, 1975, p. 1. The drafting subcommittee on wages which was subsequently established

focused its attention on proposed protective legislation where the employer shuts down all or part of his business because he has decided to relocate in another community or another state, has sold his business to or merged with another business enterprise, has liquidated or otherwise disposed of his business, or has decided to automate all or part of his business operations. *Id.* at 1–2.

It was also observed that the laws under consideration were not intended to cover the insolvent employer

> [b]ecause the state is largely preempted by federal bankruptcy laws from inacting wage priorities and other protections for employees in situations where an employer is insolvent.... *Id.* at 1. (emphasis added)

When the foregoing legislative history is considered with WIS.STAT. Chapter 109, it is evident that the Wisconsin legislature intended to strengthen the rights of employees affected by business closings by expanding the definition of wages [4]; by clearly defining when and how certain employers shall pay continuing employees as well as separated employees [5]; by increasing criminal penalties for failure to comply with the provisions of Chapter 109 [6]; and, by strengthening then existent wage assignment law, WIS.STAT. § 101.21(1), which authorizes the Department of Industry, Labor and Human Relations to investigate, adjust, take assignments to collect a valid wage claim on behalf of employees and, if necessary, pursue such collections in court. *Id.* at 4.

Section 109.09(2), is, therefore, merely one provision within several which is directed to giving wage earners and the state more clout in collecting unpaid wage and fringe benefits without contravening existing bankruptcy law applicable to insolvent employers.

### B. Construction of Federal Bankruptcy Law

■ Examination of the Bankruptcy Code reveals that one of its overriding purposes is to provide for the equitable distribution of a debtor's assets according to a fixed schedule of priorities. *See, e.g.* 11 U.S.C. §§ 507 and 724. Accordingly, § 507(a)(3) gives a third priority in the distribution of assets in a bankrupt case to

> allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—(A)

earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, which ever occurs first; but only (B) to the extent of $2,000 for each such individual.

Subsection (A)(4) of § 507, on the other hand, grants a fourth priority to

> allowed unsecured claims for contributions to an employee benefit plan—(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only (B) for each such plan, to the extent of—(i) the number of employees covered by each such plan multiplied by $2,000; less (ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

However, the Code's distribution scheme for unsecured priority claims does not affect the validity and relative priority of liens which are generally governed by nonbankruptcy lien law. *Pearlstein v. U.S. Small Business Administration,* 719 F.2d 1169, 1171–76 (D.C.Cir.1983). As the court stated in *Pearlstein,* by enacting

> section 724(b)(1) Congress did not establish a federal system of priorities between tax and nontax liens. That history establishes that Congress intended, in bankruptcy proceedings, for the relative priority of tax and nontax liens to be determined according to the law that governs the priorities of these competing interests outside of bankruptcy. *Id.* at 1171.

The court added that

> [B]y 1978 [when the Bankruptcy Code was passed] it was regarded as settled that the priority of liens recognized in bankruptcy was to be determined not by the Bankruptcy Act, but by the general nonbankruptcy lien law. *See,* 4 Collier,

---

**4.** § 109.01(3)

**5.** § 109.03

**6.** § 109.11

*Bankruptcy* ¶ 67.21, at 258–59 (14th Ed. 1978). The courts repeatedly applied this rule, and Congress, despite the numerous occasions on which it had amended the relevant provisions of the Bankruptcy Code, had not indicated any intent to change it. *Id.* at 1175.

### C. Determining Whether There Is a Conflict

In *Perez*, Mr. Justice White, quoting Mr. Justice Black's opinion in *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), observed that the court's "function is to determine whether a challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Perez*, 402 U.S., at 649, 91 S.Ct. at 1711. Mr. Justice White reasoned that,

> We can no longer adhere to the aberrational doctrine ... that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy— other than frustration of the federal objective—that would be tangentially furthered by the proposed state law.... Thus, we conclude that ... any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause. *Id.* at 651–52, 91 S.Ct. at 1712–13.

Since *Hines*, the Supreme Court has frequently adhered to this articulation of the meaning of the Supremacy Clause (citations omitted). *Id.* at 649, 91 S.Ct. at 1711.

██ In as much as federal bankruptcy law clearly leaves the determination of lien priorities to nonbankruptcy law, a state statute which creates a valid lien would not frustrate bankruptcy law and, therefore, would not be rendered invalid by the Su-

premacy Clause. It is accordingly determined that the statutory lien created by § 109.09(2) is not violative of the Supremacy Clause. In coming to this conclusion, the court notes that the Wisconsin legislative drafting committee, which considered the enactment of WIS.STAT. 109.09(2), remarked that Wisconsin's wage assignment laws were not intended to upset the wage priority scheme already set up by the bankruptcy laws and were not intended to apply to insolvent employers. *Wisconsin Legislative Council Report No. 9*, at 6.

Hence, the Wisconsin legislature was presumably aware of § 67(a)(1) and (c)(1)(B) of the existing Bankruptcy Act of 1898 and knew that subsection (a)(1) avoided liens created by legal or equitable process within four months of bankruptcy, if the person whose property was subject to the lien was insolvent and that subsection (c)(1)(B) voided statutory liens against the trustee, if the liens had not been perfected or were unenforceable against a bona fide purchaser from the debtor on the petition date. Thus, it is reasonable to conclude that when the Wisconsin legislature enacted § 109.09(2), (1) it did not intend to create a wage earners' lien which would be effective against the property of an insolvent business which filed bankruptcy within four months after failing to pay its employees and (2) it did not intend that a wage earners' lien be perfected or enforceable against a bona fide purchaser.

However, if it should be found that the foregoing does not correctly assess the legislative intent underlying § 109.09(2), the statute would elevate what would have been unsecured third and fourth priority claims under § 507(a)(3) and (4), as well as general unsecured claims to a paramount position.

### III.

### SECTION 545 OF THE BANKRUPTCY CODE

The court will, therefore, consider whether the lien created by § 109.09(2) may be avoided pursuant to 11 U.S.C. § 545. This

section authorizes the avoidance of statutory liens under the following conditions:

The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—

(1) first becomes effective against the debtor—

(A) when a case under this title concerning the debtor is commenced;

(B) when an insolvency proceeding other than under this title concerning the debtor is commenced;

(C) when a custodian is appointed or authorized to take possession;

(D) when the debtor becomes insolvent;

(E) when the debtor's financial condition fails to meet a specified standard; or

(F) at the time of an execution against property of the debtor levied at the instance of an entity other than the holder of such statutory lien;

(2) is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property at the time of the commencement of the case, whether or not such a purchaser exists;

(3) is for rent; or

(4) is a lien of distress for rent.

■ The defendants in this case argue that the wage earners' lien asserted by DILHR is avoidable by the trustee pursuant to § 545(1)(D) because the lien became effective upon Napco's insolvency. In the alternative, they argue that the trustee may avoid the lien pursuant to § 545(2) because the lien was not perfected or enforceable against a bona fide purchaser on the date Napco filed its bankruptcy petition.

The first argument must fail because "[s]ection 545(1)(D) is designed to avoid those liens that are made effective by the insolvency of the Debtor, not those that attach when the Debtor is insolvent." *Davis v. Internal Revenue Service (In re Davis)*, 22 B.R. 523, 524 (Bankr.W.D.Pa. 1981). In the case at bar, the lien created by § 109.09(2) is keyed to the date an employer fails to pay wages that are due and owing. That date is not necessarily the date the employer became insolvent. Thus, § 545(1)(D) may not be utilized to void the wage earners' lien asserted on behalf of the Napco employees.

■ The argument that the lien is avoidable under § 545(2) is well founded. The lien created by § 109.09(2) does not arise until an unpaid employee's wage claim has been *assigned* to DILHR.[7] Then, and only then, does the statute create a lien which relates back to the last date on which services were performed for the employer and for which wages are due and owing. As such, the wage earners' lien asserted in this case came into existence on October 21, 1981, and, thus, was neither perfected nor enforceable on March 2, 1981—the date Napco filed its bankruptcy petition. Therefore, the lien would not have been enforceable against a bona fide purchaser of Napco's property on that date.[8] *See, Connecticut v. Leach, (In re Leach)*, 15 B.R. 1005, 1009–10 (Bankr.D.Conn.1981); *In re Stunzi, U.S.A., Inc.* Supra. at note 6.

This finding is consistent with the general legal policy which disfavors "secret liens and charges to the injury of innocent purchasers and encumbrances for value." 51 AM.Jur.2d *Liens* § 12 (1970). *See also, United States v. Speers*, 382 U.S. 266, 275, 86 S.Ct. 411, 416, 15 L.Ed.2d 314 (1965); 3 C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION § 69.02 (4th ed. 1974).

DILHR nonetheless argues that the trustee may not avoid the wage earners' lien because of the limitations on his powers

---

**7.** The laborer's lien provided in the Virginia Code § 43–24 and discussed in *In re Stunzi U.S.A., Inc.*, 7 B.R. 401, 406 (Bankr.W.D.Va. 1980) stands in contrast to that provided by § 109.09(2) in that it indicates how and when a laborer's lien may be perfected.

**8.** It should be further noted that DILHR apparently believes that its lien was not perfected prior to the filing of its notice of liens. If it felt otherwise, there would not have been any reason for it to file the notice.

imposed by 11 U.S.C. § 546(b). However, DILHR fails to show any legal basis for that assertion. Section 546(b) provides that,

> The rights and powers of a trustee under sections 544, 545, and 549 of ... title [11] are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

A review of § 109.09(2) WIS.STAT. confirms that DILHR's argument is without foundation. Section 109.09(2) does not discuss the perfection of a wage earners' lien; it does not require seizure of the property subject to the wage earners' lien; it does not require notice of the lien; and it does not fix a time within which any action must be taken against a property subject to the lien. Thus, it is impossible for DILHR to come within the meaning of 11 U.S.C. § 546(b).[9]

### IV.

### ADDITIONAL ISSUES

#### A. The Automatic Stay

■ Turning to DILHR's request that this court rule that the post-petition filing of its lien fell within the exception to the automatic stay imposed by 11 U.S.C. § 362(b)(4), the court notes that DILHR's action was an attempt to recover a pecuniary loss suffered by Napco's employees on the basis of the authority granted to it by

§ 109.09(2) "to maintain actions for the benefit of employes...." For that reason, DILHR is precluded from relying on § 362(b)(4) which only excepts a governmental action from the automatic stay where it is an attempt to enforce a police or regulatory power.

DILHR's alternative motion, under 11 U.S.C. § 362(a), for relief from the automatic stay may not be sustained because DILHR neither alleged nor proved the existence of either "cause" or the absence of equity in the debtor's property as required by 11 U.S.C. § 362(d)(1) and (2).

#### B. Collateral Estoppel/Issue Preclusion

The defendants have urged this court to invoke the doctrine of collateral estoppel or issue preclusion and find on the basis of *Terminal,* that the issues raised by DILHR's complaint were previously decided against it. They accordingly argue that DILHR may not relitigate the issues of whether a wage earners' lien created by § 109.09(2) has priority over preexisting liens or interests and (2) whether § 109.-09(2) is constitutional.

■ It is well established that

> [u]nder collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. (citations omitted).
>
> ... [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own ... is as much bound ... as he would be if he had been a party to the record. (citations omitted) Preclusion of such nonparties falls under the rubric of collateral estoppel.... *Montana v. United*

---

**9.** Priority tax liens have successfully weathered attacks under § 545 as was observed in *Pearlstein v. U.S. Small Business Administration,* 719 F.2d 1169, (D.C.Cir.1983); *Cambron Tool Company v. Manufacturers Bank of Detroit (In re Cambron Corporation),* 27 B.R. 723 (Bankr.E.D. Mich.1983); *Geiger v. City of Southfield (In re Continental Credit Corp.,* 1 B.R. 680 (Bankr.N.D. Ill.1979). A key to the survival of those liens appears to have been statutory language which indicated when, how and against whom the lien was perfected.

*States,* 440 U.S. 147, 153–54 [99 S.Ct. 970, 973–74, 59 L.Ed.2d 210] (1979). *See also,* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).

■ In as much as collateral estoppel only applies to those issues which were actually litigated and essential to the court's judgment, this court is compelled to find that DILHR is not precluded from relitigating the constitutionality of § 109.-09(2) in this case. There is nothing in the record here to show that determination of the constitutionality of § 109.09(2) was necessary for the Waukesha County Circuit Court's decision in *Terminal,* and so collateral estoppel has not been properly invoked with respect to that issue.

■ The court also finds that it should not invoke collateral estoppel to preclude DILHR from relitigating the lien priority decided in *Terminal.* The potential adverse impact that the doctrine would have on Wisconsin wage earners could be substantial. In consideration of the above, the relative newness of § 109.09(2), the unsettled state of the case law in Wisconsin on the doctrine of mutuality [10] and the absence of a Wisconsin appellate court decision, this court feels that the circumstances in this case are such that it should follow one of the exceptions to the general rule for invoking collateral estoppel as mentioned in *Montana v. United States,* 440 U.S. at 155, 99 S.Ct. at 974 and set forth with particularity in § 28(5)(a) of the RESTATEMENT (SECOND) OF JUDGMENTS (1982) which states:

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action....

The Comments which follow read in pertinent part:

g. *Rationale for Subsection (5).* As stated in the introduction to Title E, the policy supporting issue preclusion is not so unyielding that it must invariably be applied, even in the fact of strong competing considerations. There are instances in which the interests supporting a new determination of an issue already determined outweigh the resulting burden on the other party and on the courts. But such instances must be the rare exception, and litigation to establish an exception in a particular case should not be encouraged. Thus it is important to admit an exception only when the need for a redetermination of the issue is a compelling one.

h. *Potential adverse impact on persons not parties.* There are many instances in which the nature of an action is such that the judgment will have a direct impact on those who are not themselves parties. For example, an agency of government may bring an action for the protection or relief of particular persons or of a broad segment of the public, or an individual may sue as representative of a class. In such cases, when a second action is brought, due consideration of the interests of persons not themselves before the court in the prior action may justify relitigation of an issue actually litigated and determined in that action.

The court is persuaded that this exception is intended for use in a case such as the matter at bar.

## CONCLUSION

In light of the above, the court finds that § 109.09 does not apply to a debtor under

---

**10.** This issue relates to Harvey who was not a party in the *Terminal* case and is not otherwise able to invoke collateral estoppel. *Lindsay v. Cutter Laboratories, Inc.,* 536 F.Supp. 799 (W.D.

Wis.1982); *State ex rel. Flowers v. Department of Health and Social Services,* 81 Wis.2d 376, 260 N.W.2d 727 (1978).

the Bankruptcy Code who failed to pay its employees due to insolvency.

The court further finds that regardless of whether Napco was solvent when it failed to pay its employee's wages, the lien created by § 109.09(2) is voidable pursuant to 11 U.S.C. § 545(2).

\*   \*   \*   \*   \*   \*

To the extent that the court made inconsistent oral findings in this case, they are hereby vacated.

## APPENDIX

Notably absent from § 109.09(2) are any provisions relating to perfection of the lien by notice or any other means. Also absent is any discussion of the effect of this lien on a bona fide purchaser. However, fundamental fairness dictates that notice of the lien and an opportunity to defend against it should be given to parties in interest. The fact that 109.09(2) adopts the lien enforcement procedures provided in WIS.STAT. §§ 409.501 to 409.507 (Wisconsin Uniform Commercial Code) and 779.09 to 779.12 (Wisconsin Construction Lien Law) but ignores the lien perfection and notice procedures provided by those chapters is disturbing to say the least.[1]

The difference between section § 109.09(2) and other Wisconsin lien statutes was a source of concern and discussion in *Terminal*. DILHR intervened in the that case as an assignee of the Falls Foundry Company former employees' wage claims, pursuant to WIS.STAT. § 109.09(2). In doing so it asserted that it held a priority lien on fire insurance proceeds which were paid into court and subsequently distributed.

In that case, the Waukesha County Circuit Court held that the statute did not retroactively apply to liens perfected before its effective date of June 11, 1976, and that if the statute were given retroactive effect, it would not have priority over liens which had already been perfected as of the last date on which Falls Foundry's former employees performed services. In reaching that conclusion, the court adopted arguments in the briefs of two of the parties as follows:

> It is very unusual for any lien to be given priority over liens or security interests which are already in existence and have already been properly filed or recorded. In general, liens are given priority only as of the date of filing or recording and only over liens filed or recorded after that date. *See, e.g.*, sec. 409.312(5); 706.08, STATS.

> .   .   .   .   .

> Where priority is not based on the time of filing or recording, it is based on some other event which would be clearly ascertainable by creditors. One example is perfection by possession. Section 409.305, STATS. Another example is the priority for mechanic's liens which is based on 'the visible commencement in place of the work of improvement.'

---

1. Chapter 779 of the Wisconsin Statutes contains clearly defined procedures for perfecting and relating back a variety of liens. For example, construction lien claimants must give at least thirty days notice to the landowner of the claimant's intent to file a lien claim and the actual filing of the lien must be within six months from the date the last labor and materials were furnished on the construction job, WIS. STAT. § 779.36; mining lien claimants must file in the office of the clerk of the circuit court of the county in which the real estate on which a lien is claimed is situated within sixty days after payment for labor or services is due, WIS.STAT.

§ 779.36; and threshing, husking or baling lien claimants must file in the office of the register of deeds of the county where the services were performed within 15 days from the completion of such services in order for the lien to apply to an innocent purchaser for value, WIS.STAT. § 779.50(3).

In addition, the court observes that Virginia imposes certain deadlines for filing statutory wage earners liens that are similar to the deadlines imposed on lien claimants under Chapter 779 of the Wisconsin Statutes. *See, In re Stunzi, U.S.A., Inc.,* 7 BANKR. 401 (Bankr.W.D.Va. 1980).