Ralph BARNETT, Philip Liss, and Louis Levit, Trustee of the Bankrupt Estate of Burton L. Stern, Plaintiffs,

v.

Burton L. STERN, Individually and as Trustee of the Burton L. Stern Trust dated August 1, 1978, Todd Stern, Individually and as Trustee of the Nationwide Trust dated March, 1985, Defendants.

No. 85 C 144.

United States District Court, N.D. Illinois, E.D.

Nov. 30, 1988.

Robert Frankenstein, Joel L. Widman, Kozlicki, Widman & Goldberg, Ltd., Chicago, Ill., for plaintiffs.

Allan E. Levin, Donald L. Johnson, Johnson & Schwartz, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiffs Ralph Barnett ("Barnett"), Philip Liss ("Liss") and Louis Levit ("Levit"), have brought this action against defendants Burton L. Stern ("Burton") and Todd Stern ("Todd") under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The case came before this court as a bench trial in September, 1987. The court has reviewed the evidence and arguments presented by the parties, and now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 1965, Barnett filed a lawsuit in Illinois state court against Burton seeking $44,800. The next year, Liss did likewise for $15,000. In 1968, while those two cases were pending, Burton filed for bankruptcy in federal court, 68 B 4803 (N.D.Ill.). The bankruptcy judge subsequently sustained objections to discharge filed by Barnett and Liss. In 1977, after Burton had exhausted his appeal, the denials of discharge were affirmed.

In August, 1978 Burton created the Burton L. Stern Trust ("the B.S. Trust"[1]). The trust named Burton as trustee and Burton's children as beneficiaries. Burton transferred nearly all of his assets into the trust in order to avoid the claims of his wife, who was divorcing him, and those of his other creditors. The trust had assets exceeding $1,000,000, including businesses located in Indiana and Wisconsin.

For many years, Burton successfully kept the trust's funds out of the reach of his creditors. He did not, however, operate the trust for the benefit of his children. Instead, he treated the money as his own, using it to pay not only for ordinary living expenses, but for recreation and personal loan obligations as well. Burton used the United States mails for many of these payments.

On January 28, 1983 Barnett and Liss prevailed in their state litigation—consolidated as 78 L 17700—against Burton and became judgment creditors in the amounts of $84,186.66 and $28,187.50, respectively. When they attempted to collect on these judgments, however, Burton informed them that he did not have sufficient funds

to pay them. During a citation to discover assets in December, 1983, Burton testified that he had no assets, that he had not created a trust or transferred any assets to a trust, and that all of his living expenses were provided by his children.

By early 1985, Burton's luck was running out. The law firm Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., having also obtained a state court judgment against Burton, would not accept his protestations of poverty—a lawyer in the firm had helped Burton set up the B.S. Trust some seven years earlier—and moved the state court to order Burton to turnover funds from the B.S. Trust. In April, the court granted the motion, finding that the B.S. Trust was a sham created by Burton to conceal assets from his creditors, and instructing Burton to pay the firm with assets of the trust. *Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C. v. Stern*, 82 L 8086 (Circuit Court of Cook County, April 18, 1985).

Meanwhile, Barnett and Liss had also learned of the existence of the B.S. Trust, and they were even less amused. On January 5, 1985, they filed this lawsuit against Burton, alleging that his misrepresentations to them regarding his financial condition, and his use of the B.S. Trust to conceal his assets, violated RICO. They sought treble damages pursuant to 18 U.S.C. § 1964(c), and also moved for a preliminary injunction to prevent him from further depleting the B.S. Trust. On August 2, 1985, United States Magistrate Lefkow ruled that the B.S. Trust was a sham, that Burton was continuing to deplete the assets of the trust, and that plaintiffs had a reasonable likelihood of prevailing on their claims. On September 26, 1985, District Judge Moran adopted the magistrate's findings and granted the injunction.

Unfortunately, Burton had beaten his creditors to the punch. In March, 1985, while the state and federal court actions against him were still pending, he had closed out the B.S. Trust's bank account

---

**1.** All parties referred to the Burton L. Stern Trust as the "B.S. Trust" in their briefs and oral

presentations to this court.

and had transferred the funds into the bank account of another trust, the Nationwide Trust. This trust had been created by Burton's son Todd on March 1, and named Todd as trustee and Burton's other children as beneficiaries. In the ensuing months, most of the B.S. Trust's remaining assets found their way into the Nationwide Trust.

Todd was named as the Nationwide Trust trustee, but Burton controlled it. Todd signed a few documents and checks, and authorized a signature facsimile stamp for Burton's use in trust activities; Burton did everything else, using the Nationwide Trust, as he had the B.S. Trust, to buy and sell businesses, pay personal expenses and, in general, live a very comfortable life. Burton operated the trust out of Wisconsin, but his work on behalf of trust business took him to a number of states. In addition, Burton made payments with trust funds through the United States mails.

On August 23, 1985, with most of the B.S. Trust assets hidden in the Nationwide Trust, Burton filed a bankruptcy petition in federal court. *In Re Burton L. Stern, Debtor*, 85 B 10870 (Schwartz, B.J.). Although he initially omitted reference to the B.S. Trust in his list of assets, he eventually added them by amendment. He did not, however, mention the Nationwide Trust, and for the next eighteen months he spent more than $102,000 of trust funds.

In May, 1986, the bankruptcy court appointed Levit as a Chapter 7 trustee of the bankrupt estate. Levitt soon instituted an adversary proceeding against the Nationwide Trust, alleging that the Nationwide Trust was the alter-ego of Burton and asking the bankruptcy court to declare all trust assets parts of the bankrupt estate. Both Burton and Todd received notice of the proceeding and had the opportunity to present evidence and make arguments to the bankruptcy court. On December 15, 1986 the court entered judgment for Levit, finding that, since the date of its creation, the Nationwide Trust had been the property of Burton, and ordering Levit to assume control over all Nationwide Trust assets. *Levit v. Nationwide Trust*, 86 A 981 (Bkrptcy.N.D.Ill.).

While Levit was prosecuting his case before the bankruptcy judge, Barnett and Liss were seeking relief from the automatic stay, which had gone into effect the day Burton had filed his petition. *See* 11 U.S.C. § 362. On June 24, the bankruptcy judge granted their request. His order authorized them to proceed with their RICO/fraud case in district court "only for the purpose of establishing the amount of their claim against Burton L. Stern," and stated that "[a]ny recovery arising out of the RICO/fraud case shall be the property of the estate to the extent said recovery is collected from assets and proceeds of assets which may be claimed as property of the estate." *In Re Burton L. Stern, Debtor*, 85 B 10870 (June 24, 1986). A few months later, the bankruptcy judge authorized Levit to join the RICO case as a plaintiff in order to protect the interests of the estate.

All three plaintiffs subsequently amended the complaint. Barnett and Liss added RICO and fraud claims against Burton and Todd (individually and as Nationwide Trust trustee) for their conduct with respect to the Nationwide Trust from March through August, 1985; Levit added a single RICO claim for the alleged depletion of estate assets—i.e., $102,000 of Nationwide Trust funds—after the date Burton filed his bankruptcy petition.

## CONCLUSIONS OF LAW

Plaintiffs divide the case into five counts, with Barnett and Liss joining together in Counts I through IV and Levit alone pressing Count V. The first four counts allege essentially the same injury, the inability to collect on the state court judgment, but seek recovery under a variety of factual and legal theories. The fifth focuses on a different aspect of the case.

Counts I and II name Burton alone, alleging that he violated RICO, 18 U.S.C. § 1962(c), and Illinois common law through his fraudulent scheme to conceal assets of the B.S. Trust from his creditors. Counts III and IV name both Burton and Todd, alleging the same theories of liability as the first two counts but with respect to the

operation of the Nationwide Trust. Plaintiffs request treble the amount of their state court judgments pursuant to RICO, 18 U.S.C. § 1964(c), as well as $500,000 in punitive damages for the fraud.

■ Count V also arises under § 1962(c) of RICO and is predicated on the same fraudulent scheme alleged in Count III. This count differs from that one, however, inasmuch as it names only Todd as a defendant and describes the injury as the depletion of estate assets following the commencement of the bankruptcy case. Levit asks for treble this amount under § 1964(c).[2]

*Standing*

■ Before turning to the merits, the court must address a problem created by Burton's initiation of bankruptcy proceedings while this case was pending. Recent developments in bankruptcy law call into question the standing of Barnett and Liss to pursue their claims after the bankruptcy case began. Since standing is jurisdictional, the parties' failure to raise the issue does not permit the court to overlook it. *See Ostano Commerzanstalt v. Telewide Systems, Inc.,* 790 F.2d 206 (2d Cir.1986) (jurisdictional issues arising from bankruptcy case cannot be waived).

The bankruptcy judge granted Barnett and Liss relief from the Bankruptcy Code's automatic stay "only for the purpose of establishing the amount of their claim against Burton L. Stern." Yet, plaintiffs proceeded to join Todd as a defendant, and to amend their complaint with two counts against him. The propriety of these amendments thus turns on whether the stay applied to Todd in the first instance, for it if did, then the amendments violated the stay. *See In re Opelika Mfg. Corp.,* 66 B.R. 444 (Bkrptcy.N.D.Ill.1986) (court may impose conditions on lifting of stay).

■ Furthermore, although the bankruptcy judge did purport to lift the stay for the claims against Burton, that court obviously cannot expand the jurisdiction of this one. If Barnett and Liss lacked standing to proceed on these claims once the bankruptcy case began, then the bankruptcy court's order cannot save them. *See Carlton v. BAWW, Inc.,* 751 F.2d 781 (5th Cir. 1985). As it turns out, the inquiry required by the claims against Todd answers the jurisdictional question for these claims as well.

The trustee of a Chapter 7 debtor performs a dual role as representative of the bankrupt estate. *Koch Refining v. Farmers Union Cent. Exchange, Inc.,* 831 F.2d 1339, 1342 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). On one hand, he represents the debtor, protecting her from creditors, enforcing her pre-bankruptcy rights, and in cases of individual bankruptcy exempting certain of her property from distribution. *See In re Whet,* 750 F.2d 149 (1st Cir.1984). On the other hand, the trustee represents the creditors; he "has a duty to maximize the value of the estate," *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985), and to provide for an equitable distribution of estate property among all creditors. *Sampsell v. Imperial Paper,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941). The Bankruptcy Code provides the framework for the trustee's work.

Section 704(1) of the Bankruptcy Code instructs the trustee to "collect and reduce to money the property of the estate for which the trustee serves...." Under § 541(a)(1), "property of the estate" includes "all legal and equitable interests of the debtor in property as of the commencement of the case." This provision encompasses both tangible and intangible property, including rights of action, *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1274–75 (5th Cir.1983), so any right that the debtor could enforce before bankruptcy becomes

**2.** Although the complaint also names the B.S. Trust and Nationwide Trust as defendants in claims under §§ 1962(a) and (b) of RICO, plaintiffs dropped the latter claims in their final pretrial order and then (wisely) omitted reference to these trusts as defendants. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987) (enterprise cannot be a defendant under § 1962(c)). Accordingly, these defendants will be dismissed.

"property of the estate", and thus enforceable by the trustee, upon the filing of the petition. *In re Ozark Restaurant Equipment Co., Inc.,* 816 F.2d 1222, 1225 (8th Cir.1987) ("[W]henever a cause of action 'belongs' to the debtor corporation, the trustee has the authority to pursue it in bankruptcy proceedings."), *cert. denied,* — U.S. ——, 108 S.Ct. 147, 98 L.Ed.2d 102 (1988).

Other provisions of the Code give the trustee certain rights in addition to those he acquires through § 541(a)(1). Most important are §§ 544–549, 553(b) and 724(a), which authorize the trustee to avoid fraudulent and preferential pre-bankruptcy transfers by the debtor, and § 550, which permits the trustee to recover this property or its equivalent from third-party transferees. Under § 541(a)(3), any property that the trustee recovers under these sections becomes property of the estate. Thus, the trustee may accumulate for the distribution to creditors not only property that belonged to the debtor at the beginning of the case but also property previously transferred that should be part of the equitable distribution.

The trustee's avoiding powers would not ensure equitable distribution, however, if the trustee had to compete with individual creditors for estate property. Statutory and common laws give creditors many rights against transferees similar to those of the bankruptcy trustee. Compare Ill. Rev.Stat. ch. 59, § 4 (fraudulent conveyances) *with* Bankruptcy Code, 11 U.S.C. § 548; *see also* Bankruptcy Code, 11 U.S.C. § 544 (trustee acquires rights of creditors under applicable state law). Without some limitation on creditors' ability to enforce these rights, the filing of bankruptcy would bring "a multijurisdictional rush to judgment." *In re MortgageAmerica Corp.,* 714 F.2d at 1274. Another important provision of the Code addresses this problem.

■ Section 362(a) imposes an automatic stay on a host of legal and quasi-legal proceedings involving the debtor and his property upon the filing of the petition. Many of its subsections overlap, *compare,* § 362(a)(1) *with* § 362(a)(5), but the one

giving rise to the most litigation in recent years is § 362(a)(3). This subsection stays "any act to obtain possession of property of the estate or of property from the estate." 11 U.S.C. § 362(a)(3).

On its face, § 362(a)(3) bars creditor actions against third parties to obtain property owned by the debtor at the commencement of the case, *see* § 541(a)(1), as well as such actions to obtain property that the trustee has recovered for the estate, *see* § 541(a)(3). Strictly speaking, however, it does not prohibit creditor actions to obtain possession of property that the trustee *might recover* from third parties—either by enforcing the debtor's rights of action or by avoiding improper transfers—but has not. *See* § 541(a)(3) (property of the estate includes "any interest in property that the trustee *recovers* [under his avoiding powers]) (emphasis added); *In re MortgageAmerica Corp.,* 714 F.2d at 1274 n. 7 ("[I]t is unnecessary for us to decide whether the phrase 'any interest in property that the trustee recovers' may be read '*might* recover' at some time in the future."). (Emphasis in original). A right of action, though an intangible property right itself, is not tantamount to the tangible property recoverable by enforcing it. *See 8 Am.Jur.2d: Bankruptcy* § 482 at 780 (for trustee to recover property under his avoiding powers he must first establish his entitlement to it); *cf. Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Two established doctrines of bankruptcy law prevent creditors from suing third parties for property which may become property of the estate. With regard to rights of action held by both debtor and creditor prior to bankruptcy, courts have long held that the commencement of a bankruptcy case vests the trustee alone with rights of action previously available to both. *Koch Refining v. Farmers Union Cen. Exchange, Inc.,* 831 F.2d at 1343; *Hanover Insurance Co. v. Tyco Industries, Inc.,* 500 F.2d 654 (3d Cir.1974); *see also Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Thus, once the petition is filed

creditors lack standing to assert these claims.

Through somewhat different reasoning, courts have also determined that creditors may not pursue property fraudulently transferred by the debtor before entering bankruptcy. Although the transferee may have colorable title to this property, it is said that the trustee retains—or more aptly, obtains—"a legal or equitable interest[ ]" in it by virtue of the avoiding powers. *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142 at 1150 (5th Cir.1987); *see also Glenny v. Langdon*, 98 U.S. 20, 25 L.Ed 43 (1878); *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857 (10th Cir.1986). Thus, § 541(a)(1) and § 362(a)(3) combine to divest creditors of standing to sue for this property.

These two lines of cases produce a single result: When the trustee has standing, creditors do not. Barnett and Liss, two of Burton's creditors, predicate their theory of damages on the purported injury they suffered as a result of defendants' schemes to hide Burton's assets from his creditors. They contend that these schemes made it impossible to satisfy their state court judgments before Burton entered bankruptcy, and that the damage is the amount of these unsatisfied judgments. Although the two creditors do not ask the court to award damages for injuries to the other creditors, it is evident that, to the extent they are entitled to a remedy, all of Burton's creditors could make identical arguments with regard to their unsatisfied claims.

Common sense suggests that the trustee should pursue such generally-applicable claims in a single proceeding, and that accordingly Barnett and Liss lack standing here. Indeed, plaintiffs recognized that Levit had the exclusive right to prosecute the claim for post-petition injuries, *see Dana Molded Products v. Brodner*, 58 B.R. 576 (N.D.Ill.1986) (§ 541(a)(7) gives the trustee the exclusive right to pursue claims for post-petition injuries to estate property); *accord Kremen v. Black*, 55 B.R. 1018 (D. Maryland 1985), and there appears no practical reason for distinguishing between the pre-and post-petition claims here.

Common sense, however, does not have a specific provision in the Code, and its absence poses a problem for trustee standing here. Because Burton participated in the wrongdoing, he had no right of action for the injury to his property, and thus no such right passed to the trustee when the bankruptcy case began. Similarly, the avoiding powers given to the trustee by the Code do not include the right to bring RICO and fraud claims for pre-petition injury to creditors. Thus, these claims fall outside the specific terms of trustee power under the Code.

Until recently, this lack of statutory authority would have been fatal, for courts had consistently ruled that the trustee was bound by the Code's explicit language. *E.g., In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d at 1229–30. The trustee stood in the creditors' shoes for many purposes, but he could not sue third parties on behalf of creditors, even on behalf of *all* creditors, when the creditors' causes of action did not either belong to the debtor at the moment of bankruptcy, or fall within the trustee's specific powers to avoid certain pre-bankruptcy transfers. *Id.; Cissell v. American Home Assurance Co.*, 521 F.2d 790 (6th Cir.), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976); *Wayne Film Systems v. Film Recovery Systems*, 64 B.R. 45 (N.D.Ill.1986); *In re Green Valley Seeds, Inc.*, 27 B.R. 34, 36 (Bkrptcy.D.Ore.1982). *Contra In re Western World Funding Corp.*, 52 B.R. 743 (Bkrtcy.Nev.1985).

The issue arose most frequently in alter ego suits—i.e., suits by creditors (or trustees) of bankrupt corporations alleging that the assets of corporate insiders actually belong to the corporate estate because the insiders have abused the limited liability of the corporate entity. Courts acknowledged that if the trustee were allowed to bring the claim, and prevailed on it, "the interest of every creditor of the bankrupt and the bankrupt itself [would] be altered. Conceivably, the outcome of th[e] suit could render the bankrupt solvent." *Stephyr Daimler Puch of America Corp. v. Pappas*, 35 B.R. 1001, 1005 (E.D.Vir.1983).

Nevertheless, with rare exception, they ruled that the trustee does not have standing to bring this claim: the corporation cannot "pierce its own veil" prior to bankruptcy, so no right to do so vests in the trustee; and an alter ego action does not fall within the strict terms of the trustee's avoiding powers.[3] *See, e.g., In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d at 1229; *In re Curtina Int'l*, 15 B.R. 993 (S.D.N.Y.1981). *But see Stephyr Daimler Puch of America Corp. v. Pappas*, 35 B.R. at 1004.

Recently, this formalistic approach has been giving way to a more pragmatic analysis. A growing number of courts have reasoned that the Bankruptcy Code's fundamental principle of equitable distribution among creditors requires that the trustee pursue causes of action, such as alter ego claims, available to creditors generally. *E.g., Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir.1987). The Seventh Circuit has adopted this approach.

In *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987), the Court ruled that a debtor-corporation's trustee, rather than its creditors, has the exclusive right to bring an alter ego claim against corporate insiders. The Court explained:

> [T]he trustee has no standing to bring *personal* claims of creditors. A cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought be the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors it is a general claim.

\*     \*     \*     \*     \*     \*

The equally valid mirror image principle is that a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and had personally been injured only in an indirect manner.

\*     \*     \*     \*     \*     \*

To determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors.

*Id.* at 1348–49 (emphasis in original) (citations omitted). The court then found that the alleged wrongdoing—i.e., corporate mismanagement—impacted on the creditors generally, and ruled that the individual plaintiff-creditors did not have standing to pursue their alter ego claims. *Id.* at 1350; *see also Matter of Kaiser*, 791 F.2d 73 (7th Cir.1986) (alter ego claim brought by trustee under Wisconsin law).

The *Koch* opinion focused on the "equitable" nature of the alter ego doctrine under the applicable state law, and distinguished contrary rulings in other courts as predicated on the difference in the state law they applied. In this way, the opinion gives the impression that the case did not represent a significant step in the development of trustee standing.

The concurring judge, however, clarified what the majority was doing. Pointing out that under Illinois law the claimant-creditors' alter ego claims did not belong to the debtor prior to bankruptcy, and thus technically did not become property of the estate upon the filing of the petition, he nevertheless joined the majority: "Policy

---

**3.** Some of these cases have relied on the Supreme Court's ruling in *Caplin v. Marine*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), and a subsequent Congressional decision not to overrule it. In *Caplin*, the Court held that a Chapter X trustee could not bring suit against indenture trustees on behalf of debenture holders. *Id.* at 434–35. Congress later drafted a proposed subsection for § 544 that would have allowed trustees to sue on behalf of individual or groups of creditors, but the final version of the bankruptcy bill omitted this subsection without explanation. A broad reading of the Supreme Court ruling and the congressional response has led some courts to conclude that Congress made a policy decision not to allow trustees to sue on behalf of creditors where the authority to do so does not lie within other provisions of the Code.

considerations favoring vesting the action in the trustee encourage a sufficiently broad construction of § 541 to empower the trustee to bring an alter ego action." *Id.* at 1354–55 (Cudahy, J., concurring).

*Koch* supports the sensible solution that Levit, not Barnett and Liss, has standing to pursue the creditors' claims here. As noted earlier, the creditors' theory of liability applies to all of Burton's pre-bankruptcy creditors. In fact, the alleged injury—i.e., the inability to collect on the claims against Burton because of his fraudulent concealment of his assets—closely resembles an alter ego claim—i.e., the inability to collect from a debtor because its assets are held by an alter ego.

In *Bankers Trust Co. v. Feldesman*, 676 F.Supp. 496 (S.D.N.Y.1988), the plaintiff, a creditor of Braten Apparel Corporation ("BAC"), sued BAC officers under RICO for a fraudulent scheme against BAC's creditors. The alleged scheme included the fraudulent transfer of BAC assets prior to filing for corporate bankruptcy, misrepresentations regarding those asserts during the bankruptcy proceedings, and the pursuit of frivolous lawsuits against the plaintiff in an effort to further hinder and delay the plaintiff from collecting on his debt.

The district court ruled that the plaintiff-creditor had standing to sue for injuries flowing from the frivolous litigation, but did not have standing to sue for the misappropriation of corporate assets. *Id.* at 503. Because "[e]quitable distribution, the fundamental principle of bankruptcy, would be all but impossible if a creditor could employ RICO to recover misappropriated assets from the bankrupt's estate during the pendency of a Chapter XI reorganization," *id.* at 501, the district court reasoned that only the trustee should have standing to bring RICO claims for these funds. Accordingly, the court dismissed the creditor's claims with prejudice.

The Second Circuit reversed. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988). The Court agreed with the district court that the trustee could bring RICO claims for the misappropriation of the debtor's assets, and that, accordingly, the claims of the creditors overlapped those of the trustee. The Court also agreed that for individual creditors to pursue these claims while the bankruptcy case was pending would pose an unacceptable obstacle to the Bankruptcy Code's goal of equitable distribution. But the Court held that the appropriate solution to this problem was not to dismiss the claims with prejudice for lack of standing; instead, the Court instructed the lower court to dismiss the RICO claim without prejudice on the grounds that, until the trustee had completed his litigation against the defendants, the creditor's damages were speculative: If the trustee recovers enough funds to fully satisfy the plaintiff-creditor's claims against BAC, then the plaintiff will have suffered no injury "by reason of" the RICO violation, *see* 18 U.S.C. § 1964(c); on the other hand, if the trustee is unable to bring into the estate enough funds to pay the debt, then the plaintiff will have suffered an injury, and he will be able to pursue his claim for treble damages under RICO.

Later, this court will address the speculative nature of the damages alleged by Barnett and Liss here. That issue aside, however, this court disagrees with the Second Circuit that both the creditor and the trustee have standing to bring claims predicated on the depletion of the debtor's assets. While the Seventh Circuit has taken the lead in broadly interpreting standing under RICO, *see Horaco, Inc. v. American National Bank & Trust of Chicago*, 747 F.2d 384 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), the Court has held that where the same RICO violation injures one person directly and others indirectly, it is proper to limit standing to only the directly injured. *Carter v. Berger*, 777 F.2d 1173 (7th Cir.1985); *see Dana Molded Products v. Brodner*, 58 B.R. 576 (N.D.Ill.1986). Thus, whatever the law in the Second Circuit, the fact that this case arises under RICO rather than under the common law provides no basis for reaching a different result here than did the Seventh Circuit in *Koch*.

■ Still, one aspect of the claims here does distinguish them from the claims in

*Koch.* Under an alter ego theory, only corporate fiduciaries, not the corporation itself, are responsible; thus, the debtor-corporation in *Koch* was "not *in pari dilecto* with the wrongdoers," *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d at 1352, and the trustee did not have a conflict of interest in bringing the suit. Here, by contrast, the claims involve wrongdoing by both Burton and Todd; if successfully pursued by the trustee, they would both enhance the property of the estate—i.e., Todd would be liable to the trustee—and increase the value of creditor claims against it—i.e., each creditor would receive a proportionate increase in the value of his bankruptcy claims, *see id.* at 1348 n. 12. The trustee's dual roles—i.e. representative of the debtor and of creditors—would come into conflict.

This conflict does not, however, render the case inappropriate for trustee standing. The Code already authorizes trustees to perform a number of functions potentially detrimental to debtors. *See Commodity Futures Trading Commission v. Weintraub*, 471 U.S. at 348, 105 S.Ct. at 1990. Furthermore, where individual creditors are concerned about the effect of the conflict on the trustee's performance, they can move to intervene. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d at 1351 n. 14. Finally, if the trustee refuses to pursue the case, individual creditors can petition the court for permission to pursue it in his name. *Id.* at 1346 n. 9; *see also Carlton v. BAWW, Inc.*, 751 F.2d at 784 n. 2.

The Seventh Circuit's reference in *Koch* to two district court decisions dealing with RICO claims provides additional support for trustee standing in this case. *See Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d at 1343, citing with approval *Dana Molded Products v. Brodner*, 58 B.R. 576 (N.D.Ill.1986) and *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529 (S.D.N.Y.1985)). Although *Dana* involved only *post-petition* injuries to the estate, the Court of Appeals cited it as an example of trustee power to bring suit for pre-petition wrongdoing. More importantly, *Lumbard* specifically held that the trustee should bring RICO claims predicated on pre-petition injury to creditors, despite the fact that, as here, the debtor had been a participant in the fraud and thus could not have asserted the claims. *See also In re American Reserve Corporation*, 70 B.R. 729 (N.D.Ill.1987).

Accordingly, this court rules that Barnett and Liss did not have standing to pursue, on their own behalf, the RICO claims against Burton and Todd, and that Burton's trustee should have brought these claims on behalf of all creditors of the estate.[4] This ruling does not, however, require the court to dismiss these claims. Although part of the bankruptcy court's order does appear to contemplate that Burton and Liss would proceed here only to establish their individual claims against Burton, the court also stated that any property they recovered would belong to the estate. This statement provides a sufficient basis for treating Barnett and Liss as representing the trustee on behalf of the estate. *See Carlton v. BAWW, Inc.*, 751 F.2d 781 (5th Cir.1985). It also justifies the amendments adding claims against Todd: Since all of Burton's property already belonged to the estate, the order would be meaningless if not read as authorizing plaintiffs to add defendants who might be liable to the estate.

To summarize, then, Levit, as Burton's trustee, had standing to bring Count V against Todd for post-petition injuries to the estate. He also had standing to assert the four claims for pre-petition injuries to Burton's creditors, but the bankruptcy court authorized Barnett and Liss to pursue these claims in his place. The two creditors thus serve here as representatives of the estate. Any money they recov-

---

4. Of course, this ruling does not mean that every RICO or fraud claim asserted by a creditor following bankruptcy can, or must be asserted by the trustee. On the contrary, where the claim arises out of wrongdoing peculiar to a single creditor or group of creditors these creditors will have to pursue it on their own. *See Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037 (2d Cir.1986); *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857 (10th Cir.1986).

er will belong to the estate, and the resolution of their claims will be res judicata to the estate.

*Res Judicata*

█ Prior to trial, Todd moved to dismiss Levit's claim—i.e., Count V—on the grounds of res judicata. He maintained that Levit's adversary proceeding against the Nationwide Trust in bankruptcy court, and that court's judgment declaring the Trust to be the property of the estate and ordering Levit to assume control of its assets, barred Levit from bringing another lawsuit in federal court predicated on essentially the same wrongdoing. Levit scoffed at the motion, noting that he had not made any RICO allegations in the adversary proceeding, that Todd was not even named as a party there, and that the bankruptcy judge expressly authorized Levit to enter this case.

Because the previous litigation took place in federal court, the federal rules of res judicata apply. *Matter of Energy Co-Op., Inc.,* 814 F.2d 1226, 1230 (7th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254 (1988). For res judicata, or claim preclusion, to bar Levit's claim, three requirements must be met: "(1) an identity of the parties or their privies; (2) an identity of the causes of action; (3) a final judgment on the merits." *Id.* (*citing Federal Department Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed. 2d 103 (1981)).

Although Todd was not named as a defendant in the adversary proceeding, the bankruptcy judge explicitly stated that Todd participated in that litigation, and had the opportunity to litigate both in his individual capacity and as Nationwide Trust trustee. Such participation satisfies the first prong of the res judicata test. *Matter of Napco Graphics Art, Inc.,* 51 B.R. 757 (D.Wis.1985). Indeed, plaintiffs have vigorously argued to this court that the bankruptcy judge's factual findings in the adversary proceeding should be binding on Todd here. They cannot now turn around and insist that he was not a party in that proceeding.

Levit's second position, that the omission of a RICO claim in the bankruptcy court precludes the application of res judicata to these claims, evidences a misunderstanding of the doctrine.

In contrast to collateral estoppel, which bars issue *actually litigated and decided* in a previous lawsuit, the doctrine of "res judicata bars not only those issues which were actually decided in the prior action but also those claims which *could have* been raised."

*Shaver v. F.W. Woolworth Co.,* 840 F.2d 1361, 1364 (7th Cir.1988) (emphasis in original) (quoting *Lee v. City of Peoria,* 685 F.2d 196, 198 (7th Cir.1982)), *cert. denied,* —— U.S. ——, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988); *Matter of Energy Co-Op., Inc.,* 814 F.2d at 1230-31 ("Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost.") (Quoting Restatement (Second) of Judgments, § 24 (1982)).

Levit's claim in the adversary proceeding arose out of the same fraudulent scheme underlying his RICO claim, as evidenced by his effort to have the bankruptcy court's ruling preclude relitigation of the fraud issue here. Levit did not try to prove all of the elements of a RICO claim in that court, but that decision does not prevent the res judicata bar. He could have brought his RICO claim in the bankruptcy court, *see In re Answer-fone, Inc.,* 67 B.R. 167 (Bkrtcy. E.D.Ark.1986), so (all else equal) he cannot bring it here.

As to the third prong of the res judicata test, Levit does not dispute that the ruling in the adversary proceeding constituted a final judgment on the merits. Though the ruling did not end the bankruptcy case, finality "is interpreted more liberally in bankruptcy cases than in other federal cases." *In re Sax,* 796 F.2d 994 (7th Cir. 1986). Because the bankruptcy court's ruling resolved all of the claims in the adversary proceeding, it was final order for purposes of appeal, *Matter of Morse Electronic Co., Inc.,* 805 F.2d 262, 265 (7th Cir. 1986), and Todd can rely upon it for res judicata purposes. *See Block v. United States International Trade Commission,*

777 F.2d 1568 (Fed. Cir.1985) (important factor in determining finality of ruling for res judicata purposes is whether decision was subject to appeal).

■ Thus, the bankruptcy court ruling satisfies the three principle requirements of res judicata, and Levit's only hope for escaping the bar lies in the bankruptcy court's order authorizing him to intervene in this case. "If a court reserves for later resolution an issue that might otherwise have been adjudicated in an earlier proceeding, res judicata will not operate to bar the subsequent suit." *Matter of Energy Co-Op., Inc.*, 814 F.2d at 1233.

The order authorizing intervention preceded the court's ruling in the adversary proceeding, but it did not state that the bankruptcy court was leaving resolution of RICO claims to this court, or even suggest such an intention. On the contrary, the record from the bankruptcy court indicates that Levit did not inform that court that he believed he had a RICO claim against Todd, and that he decided to add this claim only after he entered this case. Accordingly, the exception to the bar does not apply, and res judicata entitles Todd to judgment on Count V of the complaint.

■ One additional point: In light of this court's ruling above that Barnett and Liss serve here for the trustee as representatives of the estate, it is quite likely that Burton and Todd had a valid res judicata defense to the other claims as well. This court's obligation to explore, *sua sponte*, questions of standing, however, does not apply to res judicata, an affirmative defense. Defendants did not assert the defense for these claims and this court will not do so for them.

*Merits*

1. Count I

■ Section 1962(c) of RICO provides: It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

Burton's use of the B.S. Trust to conceal his assets from his creditors amounts to a paradigmatic violation of this subsection: the B.S. Trust was an enterprise affecting interstate commerce, *see* 18 U.S.C. § 1961(4); *Appley v. West*, 832 F.2d 1021 (7th Cir.1987); Burton was associated with the trust in his capacity as trustee, *cf. McCullough v. Suter*, 757 F.2d 142 (7th Cir.1985); and Burton conducted the affairs of the trust through a seven-year pattern of mail frauds—i.e., the continuous yet related use of the mails in furtherance of a scheme to defraud, *see* 18 U.S.C. § 1341 (mail fraud); *Medical Emergency Service Organ. v. Foulke*, 844 F.2d 391, 395 (7th Cir.1988); *see also Sedima, S.P.R.L. v. Imrex Corp.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986).

■ Burton contends that his numerous crimes did not amount to a "pattern of racketeering activity" because they constituted a single scheme to defraud Barnett and Liss in a single incident. The Seventh Circuit has recently reiterated its approach to RICO patterns:

The quest for "continuity plus relationship" necessarily involves a fact-specific analysis. Among the relevant facts are: "(1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries."

*Brandt v. Schal Associates, Inc.*, 854 F.2d 948 (7th Cir.1988) (quoting *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir.1988)).

Burton committed numerous and repeated acts of mail fraud over a period of many years; he defrauded at least three creditors—Barnett, Liss and his law firm—and attempted to defraud his wife as well; and each of his victims suffered a distinct injury. Furthermore, his criminal activity came to an end only when his creditors

discovered the scheme. *See Jones v. Lampe,* 845 F.2d at 757. Thus, the only factor weighing against finding a pattern is that his activity arguably involved a single, albeit extensive, scheme. Yet, at least in this circuit, that factor alone does not remove repeated criminal acts from RICO's scope. *E.g., Morgan v. Bank of Waukegan, supra.* Burton's conduct amounted to a "pattern of racketeering activity," and as such transgressed § 1962(c). *See Levit v. Brodner,* 75 B.R. 281 (N.D.Ill.1987).

Under § 1964(c), "any person injured in his business or property by reason of a [RICO] violation ... shall recover threefold the damages he sustains and the cost of the suit including a reasonable attorney's fee." Plaintiffs theorize that their damage here is the full amount of their state court judgments. This theory has considerable appeal. Beginning in 1987, Burton em-

barked on a seven-year scheme to defraud his creditors, crying poverty while actually holding more than $1,000,000 of assets in the B.S. Trust. Plaintiffs became judgment creditors in 1983 when they prevailed in state court, but because of the scheme five years have passed and they have yet to receive a single penny from Burton. Certainly, Burton's fraud has worked an injury on them.

■■■■ Plaintiffs' theory of damages, however, contains a fatal flaw. As noted earlier, a right of action, though a valuable right itself, is not equivalent to the property which might be recovered by exercising it. Plantiffs won a judgment against Burton in 1983, but they did not execute the judgment, and thus did acquire a judicial lien on Burton's property. Plaintiffs were, and still are, general unsecured creditors, nothing more.[5] *See* Ill.Rev.Stat. ch. 110,

---

5. Courts have agreed that under Illinois law, Ill.Rev.Stat. ch. 110, § 1402 (West Supp. 1988), "a writ of execution must be delivered to the sheriff of the county in which tangible personal property is located in order to create a perfected lien upon tangible personal property of the debtor." *In re Arrow General Contractors of Roselle, Ill.,* 41 B.R. 481, 482 (Bkrptcy.N.D.Ill. 1984). Courts have disagreed, however, as to whether the initiation of a citation proceedings alone creates a judicial lien upon intangible personal property. *General Telephone Co. of Illinois v. Robinson,* 545 F.Supp. 788, 792–97 (C.D.Ill.1982); *In re Foluke,* 38 B.R. 298 (Bkrptcy. N.D.Ill.1984). Compare *Asher v. United States,* 570 F.2d 682, 683 (7th Cir.1978) ("a lien is created ... upon intangible personal property by instituting a proceeding to discover assets under Ill.Rev.Stat. chap. 110, § 73 [repealed]") *and In re Foluke,* 38 B.R. at 301 ("a judicial lien is created on a debtor's bank account the moment a citation proceeding is initiated") *and Vendo Company v. Stoner Investments, Inc.,* 7 B.R. 240, 241 (Bkrptcy.N.D.Ill.1980) (citation to discover assets creates judicial lien on intangible property) *with Kaiser–Ducett Corp. v. Chicago–Joliet Livestock,* 86 Ill.App.3d 216, 219, 41 Ill.Dec. 651, 407 N.E.2d 1149 (1980) ("[A] judgment can not become a lien against personal property unless a writ of execution is delivered to the sheriff to be properly executed. This is so for intangible as well as tangible personal property, even though a citation-to-discover-assets proceeding must also be instituted to obtain the intangible personal property of the debtor.") (Citations omitted) *and Levine v. Pascal,* 94 Ill. App.2d 43, 236 N.E.2d 425 (1968) (plaintiff became lien creditor when the writ of execution was delivered to the sheriff and could enforce the lien through citation proceedings).

While the Seventh Circuit is among the courts having stated that a judicial lien rises from the initiation of citation proceedings, *see Asher v. United States,* 570 F.2d at 683, that approach does not bind this court, for two reasons. First, the Court's statement to that effect in *Asher* was *dicta.* Second, and more important, subsequent Illinois cases have taken the opposite approach. *See, e.g., Kaiser–Ducette Corp. v. Chicago–Joliet Livestock, supra,* 86 Ill.App.3d at 219, 41 Ill.Dec. 651, 407 N.E.2d 1149. Although the federal bankruptcy court in *In re Foluke* stated that there currently exists a split in the Illinois courts because *In re Marriage of Rochford,* 91 Ill.App.3d 769, 46 Ill.Dec. 943, 414 N.E.2d 1096 (1980), had followed *Asher* rather than *Kaiser–Ducett Corp.,* this court detects no conflict between *Kaiser–Ducett Corp.* and *In re Marriage of Rochford.* The latter case held that a writ of execution is unnecessary to create a judicial lien, 91 Ill.App.3d at 775, but it also stated that a judicial lien does not arise out of a citation proceeding until a Court has issued an appropriate order compelling the judgment debtor to deliver up the intangible property. *Id.* at 777. Indeed, under the citation proceedings statute, "the Court is empowered to enjoin the transfer or other disposition of the judgment debtor's property," *Ridgewood Industries v. Ridgewood U.S.A.,* 575 F.Supp. 244 (N.D. Ill.1983) (*citing* § 2–14–2(d)(2)), and this provision would be redundant if the statute created a judicial lien on the debtor's property the moment the judgment creditor instituted the proceedings.

Accordingly, this court concludes that under Illinois law the initiation of citation proceedings alone does not create a judicial lien against either tangible or intangible personal property. Moreover, because plaintiffs have neither point-

§ 12–111; *see In re Marriage of Logston*, 103 Ill.2d 266, 278, 82 Ill.Dec. 633, 469 N.E.2d 167 (1984); *In re Arrow General Contractors of Roselle, Ill.*, 41 B.R. 481, (Bkrptcy.N.D.Ill.1984).

In two cases dating back more than a century, the Supreme Court drew a critical distinction between a general creditor and a judicial lienholder. In *Adler v. Fenton*, 65 U.S. (24 How.) 407, 413, 16 L.Ed. 696 (1860), Fenton had sold merchandise to Adler on credit. After receiving the merchandise, but before paying for it, Adler assigned it to others, for the purpose of concealing it from Fenton and avoiding payment for it. When Adler later became insolvent, Fenton sued him and his assignees for the amount of the debt as well as consequential damages.

The Supreme Court ruled for the defendants, on the grounds that the assignment itself had not damaged Fenton since Fenton had not attached the property and thus had no vested property interest it:

> Unquestionably, the claims of morality and justice, as well as the legitimate interest of creditors, require there should be protection against those acts of an insolvent or dishonest debtor that are contrary to the proscriptions of law, and are unfaithful and injurious. But the Legislature must determine upon the remedies appropriate for this end; and the difficulty of the subject is evinced by the diversity in the systems of different states for adjusting relations of creditor and debtor, consistently with equity and humanity. Bankruptcy and insolvent laws, laws allowing the attachment and sequestration of the debtor's estate, and for the revocation of fraudulent conveyances, creditors' bills, and criminal prosecutions for fraud or conspiracy, are some of the modes that have been adopted for this purpose. In the absence of special legislation, we may safely affirm, that a general creditor cannot bring an action on the case against his debtor, or against those combining or colluding with him to make dispositions of his property, although the object of those dispositions be to hinder, delay and defraud creditors. *Id.* at 412–13.

A quarter century later, the Supreme Court distinguished *Adler* in a case involving the concealment of property on which a judgment creditor had obtained a judicial lien. In *Findlay v. McAllister*, 113 U.S. 104, 5 S.Ct. 401, 28 L.Ed. 930 (1185), the court ruled for plaintiff Findlay in his suit against third persons who had obstructed his efforts to have the attached property seized. Because Findlay had a vested interest in the property by virtue of the attachment, the Court ruled that *Adler* was inapposite, *Id.* at 114–15, 5 S.Ct. at 405–06, and that a direct action against the third persons for depriving him of his vested rights would lie. *Id.*

The proliferation of bankruptcy and fraudulent conveyance laws in this century has left *Adler* and *Findlay* with only a small following. Yet, where they have surfaced the principle they established—that a general creditor does not suffer cognizable damages by the fraudulent concealment of specific property until he obtains both a judgment against the debtor and a judicial lien against the property—has survived. *See, e.g., Evans v. Burson*, 65 Okl. 114, 164 P. 471, 472 (1917) ("a general creditor has no [vested] interest in any property of his debtor that will permit him to complain of the disposition of such property or of a fraudulent inducement to the plaintiff, the result of which is to permit a disposition of debtor's property which places it beyond the creditor's reach"); *accord Miller v. Bank of Commerce*, 387 S.W.2d 691 (C.C.A.Tex.1965); *cf. Miller v. Kaiser*, 164 Colo. 206, 433 P.2d 772 (1967) (fraudulent conveyance action to collect judgment allows invalidation of conveyance but does not allow collection of damages against either transferor or transferee). *Compare* 37 Am.Jur.2d § 31 at 55–56 ("Where a person entitled to a mechanic's *lien* has taken

---

ed to any intangible property in Burton's possession at the time they instituted citation proceedings, nor made any assertion either here or in the bankruptcy court that they have a lien on

Burton's property, this court finds that they have not attained the status of judicial lienholders.

steps to enforce it, but is induced to abandon the same by false representation, he is entitled to recover the damages thereby suffered.") (Emphasis added) (citing *Alexander v. Church*, 53 Conn. 561, 4 A. 103 (1886)).

These cases do not say that judgment creditors such as Barnett and Liss have no legal remedy when a fraudulent scheme causes them to lose their right of action. The right they acquire by virtue of their judgment is a property right, *see In re Marriage of Logston*, 103 Ill.2d at 278, 82 Ill.Dec. 633, 469 N.E.2d 167, and if a RICO violation causes them to lose this right— for example, if the debtor becomes unable to satisfy the debt or if the statute of limitations for executing their judgment expires—they can bring an action in fraud to recover what they lost. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988); *see Wood v. Carpenter*, 101 U.S. 135, 25 L.Ed. 807 (1879) (judgment creditor fraudulently induced not to collect on judgment during limitation period); *accord Muraoka v. Budget Rent–A–Car, Inc.*, 160 Cal.App. 3d 107, 206 Cal.Rptr. 476 (1984); *see generally* Annotation, "Fraud and Deceit: Liability in Damages for Preventing Bringing of Action Before Its Being Barred By Statute of Limitations," 33 A.L.R.3d 1077; *cf. Sade v. Northern Natural Gas Co.*, 483 F.2d 230 (10th Cir.1973) (fraudulent inducement to sign release gives rise to liability).

But that is not the situation here. Plaintiffs have neither alleged nor proved that the value of Burton's assets declined between November 1983 and September 1984.[6] Nor have plaintiffs claimed that they have irrevocably lost their right to satisfy their judgments. On the contrary, Burton's property is now located in the bankruptcy court, and the trustee's recovery of assets from the Nationwide Trust

makes it quite possible that plaintiffs will be able to fully satisfy their judgments in that forum. Indeed, even had plaintiffs described their damages as the opportunity cost of the $115,000 for the five years since they obtained the judgments they would fail, for the Bankruptcy Code allows for the recovery of interest on unsecured claims. 11 U.S.C. § 726(a)(5). Accordingly, at least as yet, plaintiffs have not sustained the sort of injury to their "business or property" that § 1964(c) of RICO requires.[7] Burton is entitled to judgment on this claim.

### 2. Count II

To establish fraud under Illinois law, plaintiffs must prove:

1) that Burton intentionally misrepresented a material fact; 2) that the misrepresentation was made for the purpose of inducing plaintiffs to rely on it; 3) that plaintiffs had a right to rely on it; 4) that plaintiffs did rely on it; and 5) that this reliance resulted in injury.

*Zimmerman v. Northfield Real Estate*, 156 Ill.App.3d 154, 161, 109 Ill.Dec. 541, 510 N.E.2d 409 (1986).

Burton's contempt for his creditors and the law manifested itself in his flagrant misrepresentations to his creditors, at least one under oath, that he had no assets and that he depended entirely on his children for support. That he intended to induce their reliance, and that they had a right to rely on his representations, he does not dispute.

██ Burton does insist, however, that plaintiffs did not actually rely on the misrepresentations inasmuch as they continued to pursue his assets notwithstanding his statements that he had none. This

---

6. Levit proved that Burton depleted a substantial amount of Nationwide Trust assets in the period following his petition for bankruptcy. However, that depletion is relevant only to Count V.

7. · As discussed earlier in the section on standing, *supra* pp. 971–72, the Second Circuit recently ruled that until the trustee has completed his efforts to collect all assets for the estate, the creditor's damages are speculative. *Bankers*

*Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988). Because the issue arose there on a motion to dismiss, the Court dismissed the creditor's RICO claims without prejudice. Here, however, the issue has been tried, and plaintiffs have presented no evidence from which the amount of their damages can be determined. Accordingly, dismissal without prejudice is inappropriate.

argument strains credulity. To be sure, plaintiffs did not merely throw up their hands and abandon their claims. They did, however, suspend their efforts to seize his assets for over a year, instituting this lawsuit only when the existence of the B.S. Trust came to light in Burton's litigation with his old law firm. *Compare Wood v. Carpenter*, 101 U.S. 135, 25 L.Ed. 807 (1879) (judgment creditor not entitled to recover for judgment debtor's fraudulent concealment of his assets where plaintiff did not undertake sufficient efforts to discover them); *accord Dole v. Wilson*, 39 Minn. 330, 40 N.W. 161 (1888). Thus, the only question that remains is whether this reliance resulted in injury.

■ The cases discussed earlier establish that, reprehensible as Burton's conduct was, plaintiffs have not demonstrated cognizable injury resulting from it. Plaintiffs had a right of action against Burton's assets by virtue of the state court judgments, and they still possess this right.

Nearly two centuries ago, the Supreme Court of Massachusetts described another intractable problem with a claim such as the one plaintiffs have presented here:

> The uncertainty of the plaintiff's damages seems, of itself alone, to be a sufficient reason for his not recovering. In an action on the case ex delicto, the plaintiff must show injury and damage; and these must be shown as facts, by legal proofs.... How could this plaintiff prove that he suffered any damage by the acts of the defendant which are averred in the declaration? How could he prove that he would have secured his debt by attaching the property of his debtor, had the defendant not intermeddled with it? Other creditors might have attached it before him, or it might have been stolen or destroyed while in the debtor's possession. The fact that the plaintiff has suffered actual damage from the defendant's conduct is not capable of legal proof, because it is not within the compass of human knowledge, and therefore cannot be shown by human testimony. It depends on numberless

unknown contingencies, and can be nothing more than a matter of conjecture. *Wellington v. Small*, 3 Cush. (57 Mass.) 145, 145 (1804); *see also Beaton & Association v. Joslyn Manufacturing & Supply*, 159 Ill.App.3d 834, 845, 111 Ill.Dec. 649, 512 N.E.2d 1286 (1987) ("A plaintiff, as the party seeking recovery, has the burden not only to establish that he or she has sustained damages, but also to establish a reasonable basis for computing them. A court may not award damages based on speculation or conjecture.").

Plaintiffs have not shown that they would have recovered the full amount of their judgments had Burton told the truth in 1983, nor, as noted earlier, have they demonstrated that they are unable to do so at this time. Accordingly, plaintiffs have failed to prove damages as required in an action for fraud under Illinois law, and Burton is entitled to judgment on this claim as well.

#### 3. Count III

■ Plaintiffs' RICO claim against Burton and Todd for their activities relating to the Nationwide Trust fail for the same reason as do the first two counts. There is no question that defendants violated § 1962(c) by conducting this enterprise through a fraudulent scheme involving a pattern of racketeering activity; indeed, the fact that this scheme also involved bankruptcy fraud, and that Levit was an additional victim of it, makes this RICO claim even stronger than the previous one. *See Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 810 (7th Cir.1987) (RICO plaintiff may prove injury to other victims); *Levit v. Brodner*, 75 B.R. 281 (N.D. Ill. 1987) (fraudulent scheme in which defendants transferred debtor's assets to separate entity involved a pattern of racketeering activity where they extended over thirteen months and involved not only mail and wire fraud, but bankruptcy crimes as well).

Nevertheless, a RICO violation does not give rise to civil liability without proof of resultant injury, *Sedima, S.P.R.L. v. Imrex Corp.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Horaco, Inc. v. Ameri-*

*can National Bank & Trust of Chicago,* 747 F.2d at 398, and plaintiffs have failed to prove such injury in this case. Judgment will be entered for Burton and Todd on this claim.

#### 4. Count IV

Plaintiffs' fourth claim, the second against both Burton and Todd, alleges common law fraud in defendants' false representations after the creation of the Nationwide Trust that Burton's children were the beneficiaries. The rulings above control the outcome for this claim as well.

Plaintiffs have made no effort to satisfy their judgments in the bankruptcy court, nor have they attempted to demonstrate to this court that they are unable to do so. In addition, plaintiffs have not shown that, but for the fraud, they would have satisfied their judgments at an earlier date. Thus, though plaintiffs have proven fraudulent conduct by Burton and Todd against all of Burton's creditors, two hundred years of common law reject plaintiffs' action for fraud under Illinois law.

#### CONCLUSION

All claims against the Burton L. Stern Trust and the Nationwide Trust are dismissed with prejudice. The claims of plaintiffs Ralph Barnett and Philip Liss, as individual creditors of Burton Stern, against Burton and Todd Stern are dismissed, but plaintiffs are substituted as representatives of the estate for Counts I, II, III, and IV. Judgment is entered for defendants on these four claims. Judgment is also entered for defendant Todd Stern on Count V, the single claim brought by Louis Levit as Trustee of Burton Stern's estate, on the grounds of res judicata.